Richard J. Mooney (CA State Bar No. 176486)
*richard.mooney@rimonlaw.com*
RIMON P.C.
One Embarcadero Center #400
San Francisco, CA  94111
Telephone:   (415) 539-0443

Attorneys for Plaintiff Maria Corso

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Maria Corso,<br><br>                       Plaintiff,<br><br>        v.<br><br>Rejuvi Laboratory, Inc.,<br><br>                       Defendant. | CASE NO.  _____<br><br>Complaint for Judgment Pursuant to the Uniform Foreign-Country Money Judgment Recognition Act |

Plaintiff Maria Corso ("Plaintiff" or "Ms. Corso") alleges for her complaint against Rejuvi Laboratory, Inc. ("Defendant" or "Rejuvi") as follows:

### The Parties

1.      Plaintiff is and at all relevant times has been a citizen and resident of Australia.

2.      Defendant is and at all relevant times has been a citizen of the United States and of California, as it is incorporated under the laws of California and has its principal place of business in California.

### Jurisdiction and Venue

3.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(2), because it is an action between a non-U.S. citizen and a U.S. citizen, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      This Court has personal jurisdiction over Defendant, because Defendant is a citizen and resident of California; Defendant has purposefully availed itself of the privilege of conducting business in this jurisdiction and invoked the benefits and protections of the law of this jurisdiction; and the exercise of personal jurisdiction is reasonable.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendant is a resident of this judicial district.

### Factual Allegations

6.      Plaintiff in 2009 instituted an action against Defendant in the District Court of South Australia (Civil) (the "Australia Action"), and Defendant was properly served in the Australia Action.

7.      In the Australia Action, a judgment was entered in favor of Plaintiff and against Defendant on an interim basis (*i.e.*, prior to assessment of interest, costs, and attorneys fees) on June 17, 2016, and on a final basis on August 19, 2016 in the amount of AUS$1,192,545.01 (the "Australia Judgment").[1]

---

[1]      At current exchange rates, AUS$1,192,545.01 is approximately US$913,000.

8.     A true and correct copy of the Australia Judgment is attached hereto as Exhibit A.

9.     Defendant has not filed an appeal of the Australia Judgment, and the time for filing such an appeal has expired under Australian law.  The Australia Judgment is therefore a final, conclusive, and enforceable judgment under Australian law.

## First Cause of Action – Enforcement of Judgment

10.    Plaintiff re-alleges and incorporates herein all preceding paragraphs.

11.    The Australia Judgment "[g]rants or denies recovery of a sum of money" within the meaning of California's version of the Uniform Foreign-Country Money Judgment Recognition Act, California C.C.P. §§ 1715 *et seq.*

12.    The Australia Judgment "[u]nder the law of the foreign country where rendered, is final, conclusive, and enforceable" within the meaning of California's version of the Uniform Foreign-Country Money Judgment Recognition Act, California C.C.P. §§ 1715 *et seq.*

13.    The Australia Judgment in the Australia Action was rendered by a court that sits in a country that provides impartial tribunals and procedures that comport with traditional notions of due process of law.

14.    There are no judgments that conflict with the Australia Judgment.

## PRAYER

Wherefore, Plaintiff prays judgment against Defendant as follows:

1.     for entry of judgment in an amount equal to AUS$1,192,545.01, in US Dollars calculated at the exchange rate applicable on the day of judgment;

2.     for interest on that amount calculated at the applicable Australian rate from August 19, 2016 until the day of judgment;

3.     for postjudgment interest calculated at the rate applicable in this Court;

4.     for costs of suit, including attorneys' fees incurred; and

Complaint
*Corso v. Rejuvi Laboratory, Inc.* (Case No. _____)

5.       for such other relief as the Court may deem proper.


Dated:  October 3, 2016                    Rimon P.C.


By: _____
Richard Mooney
Attorneys for Plaintiff Maria Corso

Complaint
*Corso v. Rejuvi Laboratory, Inc.* (Case No. _____)

Exhibit A

# DISTRICT COURT OF SOUTH AUSTRALIA

(Civil)

## CORSO v ARIAS HOLDINGS PTY LTD & ORS

### [2016] SADC 62

**Judgment of His Honour Judge Slattery**

**17 June 2016**

## TORTS - NEGLIGENCE

## DAMAGES - GENERAL PRINCIPLES

Assessment of damages.

The plaintiff underwent treatment for the removal of tattoos at a North Adelaide salon which recommended the use of the Rejuvi Tattoo Removal Paste manufactured in the USA by the second defendant. No warning was given of known deleterious consequences of the use of such paste and the promotional material supplied by the Australian importer, the first defendant and sourced from the manufacturer, the second defendant and used by the third defendants represented falsely that following the use of the paste, the plaintiff could expect to achieve a result that her skin would be in pre-tattoo condition.

The plaintiff underwent the treatment relying upon the promotional material that she received and read. The treatment caused extreme burning, scarring and other disfigurement of the plaintiff which in turn caused severe physical, psychological and psychiatric injuries to her. The plaintiff has suffered from ongoing pain, suffering, loss of earning capacity, physical disabilities, psychiatric disabilities and loss generally. The plaintiff sues for damages. None of the defendants filed a Notice of Address for Service or a Defence. The action has proceeded as an assessment of damages.

Held:

1. The plaintiff is entitled to damages as assessed by the Court.

2. Observations about the requirement for the Court to proceed to assess damages based upon the pleaded case of the plaintiff as described in the documents that have been served upon the defendants.

*Service and Execution of Process Act (Cth)* Generally; *District Court (Civil) Rules* r 99, r 223, r 229; *"Hypertrophic Scar after chemical tattoo removal"* Drs Sainir et al, American Society for

---

Plaintiff: MARIA CORSO     Counsel: MR R. STATHOPOULOS - Solicitor: SE LAWYERS
First Defendant: ARIAS HOLDINGS PTY LTD (ACN 009 184 540) No Attendance
Second Defendant: REJUVI LABORATORIES INC No Attendance
Third Defendants: MICHELLE BABICH AND BRANKO BABICH No Attendance
Fourth Defendant: P.B.M. INVESTMENTS PTY LTD (ACN 115 359 969) No Attendance
Hearing Date/s: 08/09/2014, 13/10/2015, 27/05/2016
File No/s: DCCIV-09-1699

B

2

Dermatologic Surgery; *Dermatologic Surgery: November 2008* pp 1599-1601(©2008 by the American Society for Dermatologic Surgery Inc published by Wiley Products).; *Tracey Janos v Rejuvi Laboratories Inc* Circuit Court of Cooke County, Illinois County Department Law Division in Action No. CCG-67 (2-81); *Trade Practices Act* s 74AB, s 75AD, s 82; *Fair Trading Act* s 56, s 58(a), s 58(e), s 63, s 64, s 84; *The Hague Convention Rules* Generally; *Civil Liability Act 1936* s 52, s 58; *Mayne and McGregor on Damages* 12th Edition 1961 at page 96; *The Laws of Australia (LexisNexis publication)* paragraph [32.155] ; *Manufacturer's Warranties Act 1974* s 5, referred to.

*Young v Thomas* [1892] 2 Ch 134; *Smith v Buchan* 36 WR 631; *Faithfull v Woodley* (1889) 43 Ch D 287; *Phonographic Performance Limited v Maitra* [1988] 2 All ER 638; *Watson Specialised Tooling Pty Ltd v Stevens* (1991) 1 Qd R 85, discussed.

*Watson Specialised Tooling Pty Ltd v Stevens* [1991] 1 Qd R 85; *Boley v Owen* [1944] Tas SR 45; *Australian Competition and Consumer Commission (ACCC) v Dataline.Net.Au Pty Ltd* [2006] FCA 1427; *Arthur v Vaupotic Investments Pty Ltd* [2005] FCA 433; *Lunar Park Sydney Pty Ltd v Bose* [2006] FCA 94; *Australian Competition and Consumer Commission (ACCC) v 1 Cellnet LLC* [2005] FCA 856; *Macquarie Bank Ltd & Anor v Seagle* (2005) 146 FCR 400; *Vordemeirer v Alguna (No 3)* (1997) 195 LSJS 472; *Micarone v Perpetual Trustees* (1999) 75 SASR 1; *SP Hywood Pty Ltd v Standard Chartered Bank Ltd* (SASC Perry J, S 3764, 21 December 1992, BC 9200151, unreported); *Battye v Shammall* (2005) 91 SASR 315; *Cooper v Maloney (No 3)* [2012] SASC 153; *Banque Commerciale SA v Akhill Holdings Limited* (1990) 169 CLR 279; *Ultramares Corporation v Touche* 174 N.E. 441 (1932); *Fontin v Katapodis* (1962) 108 CLR 177; *XL Petroleum (NSW) Pty Ltd v Caltex Oil (Aust) Pty Ltd* (1985) 155 CLR 448; *Ali v Hartly Ponton Limited* [2002] VSC 113; *AB v Southwest Water Limited* [1982] MLJ 26 June 1992; *Chloroben Chemical Corp v Comegys* 464 A2d 887 (Dell 1983); *Ford Motor Co. v Nowak* 638 SW2d 582 (1982); *Rawlings Sporting Goods Co Inc v Daniels* 619 SW2d 435 (1981); *Nixon v Phillip Morris Aust Pty Ltd* (1999) ATPR 41-707; *Tetuam v AH Robins Co* 738 P2d 1210 (Kan 1987); *Crump v Equine Nutrition Systems Pty Ltd (T/A Horsepower)* [2006] NSWSC 512; *March v E & MH Stramare Pty Ltd* (1991) 171 CLR 506, considered.

# CORSO v ARIAS HOLDINGS PTY LTD & ORS
## [2016] SADC 62

### JUDGE SLATTERY

1    The plaintiff in this action Maria Corso was born on 9 October 1970 and she is currently 45 years of age. In 2007 she had tattoos on her right leg at the area of her ankle, on the outside of her leg; referred to as the distal side. She also had tattoos on her back. She wished to have them removed.

2    The first defendant, Arias Holdings Pty Ltd operated a business called 'Rejuvi Australia' and this company acted as the sole importer from the United States to Australia of the second defendant's products. One of those products was the Rejuvi Tattoo Ink Extraction Paste ("the Paste"). That product was then sold to the third defendants by Arias Holdings Pty Ltd, which also produced promotional material for the product.

3    The second defendant, Rejuvi Laboratories Incorporated ("Rejuvi") is a company incorporated in the United States of America. It produces and distributes various products within the USA and to overseas destinations. One of the products which it manufactures is the Paste. That product was manufactured by the second defendant in the United States.

4    The third defendants are Michelle Babich and Branko Babich; they owned and operated a business in North Adelaide called 'Platinum Beauty' which provided skin care and beauty services. It is pleaded in the alternative that the fourth defendant is the proprietor of this business but no evidence was led on this topic. I will not consider the position of the fourth defendant any further in this judgment.

5    None of the defendants appeared at the trial hearing before me. The trial book filed by the plaintiff at Court does not disclose any defence filed by any of the defendants. I will proceed on the basis that the defendants did not defend and did not intend to defend the proceedings.

6    Pursuant to the requirement of the Rules of Court and the *Service and Execution of Process Act* (Cth) a notice of summons to be served outside of Australia, and the first statement of claim was served upon the second defendant Rejuvi Laboratories Inc at its address at 360 Swift Avenue, Suite 38, South San Francisco, California, 94080, United States of America. The notice informed the second defendant of the claim of the plaintiff, that the action had been commenced in the District Court of South Australia and required Rejuvi to file a notice of address for service in accordance with the Rules of Court within 28 days of the service of the notice and these proceedings upon it.

7    An Affidavit of Service of Anibal Alejandro Merino of 75 Columbia Square San Francisco CA 94103, sworn 29 September 2009 has been filed at Court. In the Affidavit sworn by Ms Merino before Barbara Barrish, Commision

No. 1860186 a Notary Public of the San Francisco County of California, Ms Merino deposes that on Friday 25 September 2009 at 1.50pm at the premises at 360 Swift Avenue, Suite 38, South San Francisco, CA, 94080, USA, she served Rejuvi Laboratories Inc with the summons and statement of claim together with a true copy of the notice of summons to be served outside South Australia under the *Service and Execution of Process Act* (Cth). Ms Merino also deposes that at the time of service, the person on whom she served the documents admitted that he was authorised to accept service on behalf of the second defendant, Rejuvi Laboratories Inc. No challenge has been made to the content of the affidavit of Ms Merino which has been received into evidence before me. I accept it as proof of the facts deposed to therein. I am also satisfied that as a consequence of the content of the papers served upon it, the second defendant has been informed that if it wished to contest the claim of the plaintiff in the first statement of claim it was required to take some steps in this action including the filing of an address for service and a defence.

8    By application to the Registrar of the Court dated 8 May 2010, FDN 7, the plaintiff applied for the entry of default judgment against the second defendant pursuant to r 229 of the Rules of Court. That rule reads as follows:

229—Entry of default judgment where Court's permission not required

(1)    In the following cases, a plaintiff may enter default judgment in default without first obtaining the Court's permission to do so—

(a)    if a defendant does not file a defence to a liquidated claim within 28 calendar days after service of the plaintiff's statement of claim—the plaintiff may enter judgment in default of a defence against the defendant for an amount not exceeding the amount of the liquidated sum plus interest;

(b)    if a defendant does not file a defence to an unliquidated claim within 28 calendar days after service of the plaintiff's statement of claim—the plaintiff may enter judgment in default of a defence against the defendant for an amount to be assessed;

(c)    if a defendant does not file a defence to a claim for the detention of goods within 28 calendar days after service of the plaintiff's statement of claim—the plaintiff may enter judgment in default of a defence against the defendant—

(i)    for delivery of the goods; or

(ii)    for the value of the goods to be assessed.

(2)    In the cases to which subrule (1) refers, any non-compliance by a plaintiff with rule 33 or a provision of the Supplementary Rules requiring the taking of a pre-action step does not preclude the plaintiff from entering judgment in default without first obtaining the Court's permission.

[2016] SADC 62

3

(3)  In subrule (1)—

a *liquidated claim* is a claim for a specific amount or a claim for an amount that can be precisely calculated;

an *unliquidated claim* is a claim for an amount that requires assessment by the Court.

(4)  A plaintiff who enters judgment under this rule is, subject to any order of the Court to the contrary, entitled to costs up to the date of entering judgment and—

(a)  if judgment is entered for a specified amount – the judgment may, at the option of the plaintiff—

(i)  require the defendant to pay the plaintiff's costs to be adjudicated; or

(ii)  require the defendant to pay lump sum costs fixed in accordance with subrule (5);

(b)  if the Court is yet to assess the amount of the judgment – the Court will make the appropriate order for costs at the conclusion of the assessment proceedings.

(5)  Under subrule 229(4)(a)(ii) the costs will be fixed, without any need for the plaintiff to present details of the costs incurred, at the amount prescribed in the relevant Schedule to the Supplementary Rules in addition to the amount of the appropriate fee for the filing of the summons which was paid by the plaintiff.

9    On 7 May 2010 the Court Registry informed the plaintiff that following her administrative application, judgment had been entered against the second defendant and the matter had been set for assessment of damages. There is no requirement under the Rules of Court that the second defendant be put on notice that the plaintiff intended to obtain a judgment against it in default of the filing of an address for service or a defence. The plaintiff was entitled to proceed to an assessment of damages based upon the claims that she made against the second defendant (and all the other defendants) in her pleadings as they subsisted at the time.

10    Since that date, the plaintiff has amended her pleadings. The statement of claim before me at the hearing was the fourth statement of claim. There was no evidence before me of the service upon the second defendant or any of the other defendants of the content of the fourth statement of claim. Ordinarily it would be expected that if the plaintiff wished to maintain her claim under the Fourth statement of claim against the second defendant, then that document would have been served upon the second defendant in order to facilitate either the joinder of issues by a defence or alternatively the assessment of damages in the default of the filing of an address for service or a defence.

[2016] SADC 62

4

11      There are a number of questions that arise. The first is the basis upon which the plaintiff may proceed to assess her damages against the defendant. The second concerns the procedural matters that surround the question of the assessment of those damages. I will deal with each of those matters in turn. The relevant chronology in this action is as follows:

1. On 21 September 2007 proceedings were commenced before all defendants including the second defendant;

2. On 21 September 2007 the plaintiff lodged a notice of summons for service on the second defendant in the United States of America;

3. On 25 September 2009, the summons and statement of claim were served on the second defendant in San Francisco, California, USA;

4. On 6 May 2010 the plaintiff applied to register a default judgment against the second defendant on the basis that no notice of address for service or defence had been filed;

5. On 6 May 2010 the Registrar issued a default judgment against the second defendant for damages to be assessed;

6. On 6 July 2011 the plaintiff obtained leave of the Court to file a second statement of claim;

7. On 29 February 2012, the Court gave leave to the plaintiff to file a third statement of claim and on 6 March 2012 the third statement of claim was filed by the plaintiff;

8. On 17 January 2013, the plaintiff filed an interlocutory application for declaratory judgment and an interim assessment of damages;

9. On 7 June 2013 the Court sent to the second defendant a trial notice (in respect of the assessment of damages);

10. On 6 August 2014 the plaintiff was given leave to file a fourth statement of claim and on 7 August 2014 the plaintiff filed at Court her fourth statement of claim.

12      There is no evidence before the Court of proof that the plaintiff has served upon the defendant the second, third or fourth Statements of Claim.

13      The defendant Rejuvi Laboratories Inc has not filed a defence in accordance with the requirements of the Rules of Court. It has not nominated an address for service. It appears to have ignored these proceedings. On 7 June 2013 the Court sent to Rejuvi a trial notice in respect of the assessment of damages after the

5

plaintiff had successfully applied by interlocutory application for declaratory judgment and an interim assessment of damages.

14    As a consequence there are a number of issues that in the circumstances require separate consideration. The first issue is the method to be adopted by the Court in making an assessment of the material facts of this action. In the usual course the Court is the finder of facts having heard the evidence of the parties and submissions. The position is obviously different where, as here, there is no 'contravenor' because the defendant Rejuvi is not present at the hearing but the position is that the defendant Rejuvi had not been served with the fourth statement of claim which pleads further material facts and claims and then seeks an assessment of damages by the Court. Despite the absence of the second defendant the Court is still required to have the rights of the second defendant in mind in the administration of justice. The fourth statement of claim broadens the bases of the claims made by the plaintiff as a sequelae of her alleged injuries following the application of the Rejuvi Paste.

15    A question arises whether or not any proof is required of the facts alleged in the statement of claim of the plaintiff. In *Young v Thomas*,[1] the Court of Appeal of England was called upon to consider an appeal from a decision of Justice Kekewich at first instance on a question of costs. The action concerned an application by a plaintiff for judgment in default of a defence and one of the issues decided at first instance was whether the parties were required to look only to the statement of claim when deciding the issues between the parties. The Court of Appeal decided that the parties were so confined. At page 137, Bowen LJ said as follows:

> It was urged by the counsel for the Appellant that, because the Judge is bound to give judgment in the action according to the statements in the statement of claim, he cannot, in deciding as to the costs, look at anything outside the statement of claim. There is no doubt that, in determining the rights of the parties in the action, the statement of claim alone is to be looked to and the reason of this rule is obvious, namely, that the facts stated therein are taken to be admitted by the defendant; and, as has been decided by Lord Justice Kay in *Smith* v. *Buchan*,[2] no evidence can be admitted as to those facts. But the learned Judge was there only referring to evidence relating to the issues in the action, and to the matters alleged in the statement of claim.

16    This last point of distinction made by Bowen LJ is important in the context of this matter. That is because the plaintiff had not initially satisfied me on the balance of probabilities that the second, third and fourth statements of claim that have been filed in Court have been served upon the second defendant. This was at the time that the matter first came before this Court on the assessment of damages of the plaintiff in default of defence. The pleading refers to a statement of loss that under the Rules of Court is required to be served upon a defendant in a personal injuries claim. There is no evidence before me that a statement of loss

---

[1]  [1892] 2 Ch 134.
[2]  36 WR 631.

has been served upon the second defendant by the plaintiff. The failure to serve a statement of loss upon another party is not necessary or at all fatal to any aspect of the plaintiff's claim based upon the first statement of claim because that document sought an assessment of damages on a particular basis. It would only be if the statement of loss departed from the pleaded basis set out within the first statement of claim that any issue would arise. As I am unable to address this latter aspect, I was left with the pleading in the first statement of claim.

17    Where a defendant does not appear or defend an action commenced by a plaintiff, then that defendant is deemed to have admitted all of the allegations made against him in the pleading. The deemed admission operates only in respect of the claim set out in the pleadings. Where there is a claim for unliquidated damages, then the party who has failed to appear or to file a defence is only taken to have admitted liability for such damages but not the quantum. In order for the deemed admission to apply to the question of quantum of the damages, then the party in default must be given the opportunity of coming to the Court and making submissions on the quantum of those damages.[3]

18    The Federal Court has held that the only admissions made by the dilatory defendant who has failed to appear and file a defence are admissions as to the allegations of fact contained within the pleadings. Those admissions can only relate to questions of fact. The dilatory defendant does not then automatically concede the relief sought because that is not necessarily or at all the subject of an admission of an allegation of fact.[4] A decision on that issue involves questions of fact and law. A party may be entitled to obtain any relief arising from the material facts disclosed on the face of the statement of claim. Regard may be had to the pleadings on the material facts in the statement of claim to determine whether any particular relief sought is established.[5] By extension of reasoning, no evidence need be led in relation to the facts disclosed on the statement of claim because those facts are the subject of the admission by the dilatory defendant.[6]

19    A Court will recognise a connection between the relief sought in the statement of claim and the material facts which are pleaded within it. In *Faithfull v Woodley*,[7] North J confirmed that the relief sought in a statement of claim is the only relief which may be given to a plaintiff against a defendant who does not appear at the trial. At page 289, North J held that (the defendant's admission under the default rule):-

---

[3]   *Watson Specialised Tooling Pty Ltd v Stevens* [1991] 1 Qd R 85 at 93-94; *Boley v Owen* [1944] Tas SR 45.

[4]   *Australian Competition and Consumer Commission (ACCC) v Dataline.Net.Au Pty Ltd* [2006] FCA 1427 at [44].

[5]   *Arthur v Vaupotic Investments Pty Ltd* [2005] FCA 433; *Lunar Park Sydney Pty Ltd v Bose* [2006] FCA 94.

[6]   *Australian Competition and Consumer Commission (ACCC) v 1 Cellnet LLC* [2005] FCA 856; *Macquarie Bank Ltd & Anor v Seagle* (2005) 146 FCR 400.

[7]   (1889) 43 Ch D 287 at 289.

7

…must be taken as made only for the purpose of the relief which is asked for by the statement of claim.[8]

In *Dataline*, Kiefel J considered that this rule is based upon concepts of fairness in the conduct of litigation and that what is required under the Rule may consequently differ from case to case. The correct approach is that the right to relief of a plaintiff (where there has been a dilatory defendant) is that which arises from the allegations of fact within the statement of claim.

20    Rule 99 of the Rules of Court sets out the requirements for a statement of claim of a plaintiff as follows:

99—Requirements for statement of claim

(1)    A statement of claim—

(a)    must state each cause of action; and

(b)    must state the basis of each cause of action (including reference to any statutory provision on which the plaintiff relies); and

(c)    must contain a short statement of the material facts and matters on which each cause of action is based; and

(d)    must state any remedy for which the plaintiff asks; and

(e)    if the plaintiff seeks an ancillary remedy (such as an extension of a period of limitation or a temporary injunction)—must state the nature of the remedy and the basis on which it is sought.

(2)    If the plaintiff relies on separate causes of action, the statement of material facts and matters must differentiate between—

(a)    facts and matters that are common to both or all causes of action; and

(b)    facts and matters that are relevant only to a particular cause of action.

(3)    If a plaintiff claims damages for personal injury, the statement of claim must state—

(a)    the general nature of the injury and any resulting disability; and

(b)    the general nature of treatment received; and

(c)    the general effect of the injury and any resulting disability on the plaintiff's—

(i)    capacity to work; and

(ii)    enjoyment of life; and

(d)    the kinds of economic and non-economic loss suffered by the plaintiff,

---

[8]    See *Dataline* at [46].

8

(but is not to contain details of treatment and loss that are required for the statement of loss).

21    This Rule required the plaintiff to plead the cause of action, the basis for the cause of action, the material facts on which the cause of action is based and the remedy sought by the plaintiff. In claims for damages for personal injury, the statement of claim must also state the general nature of the injury and the resulting disability as well as the general notice of the treatment received, the general effect of the injury and any resulting disability on the plaintiff's capacity to work and to enjoy life. It is also necessary to describe the economic and non-economic loss suffered by the plaintiff. At common law, the relief granted must be consistent with the case made out in the pleadings although, unless it is unfair to a defendant, the Court may grant any relief to a plaintiff which has not been sought in a statement of claim but which is justified on the basis of the evidence given at trial.[9] This is a practical rule of application and ensures that a trial judge is not technically fettered about the types of relief to be granted but which have not been agitated at trial.[10]

22    Rule 223 of the Rules of Court provides as follows:

> 223 The Court may, in an appropriate case, give judgment for a form of relief that differs from the kind of relief sought by the plaintiff.

23    At common law a Court may give judgment on any cause of action available on the material facts disclosed on the face of the pleadings.[11] A failure to plead a particular form of relief as required by rule 99 will not preclude a Court from using rule 223 to grant that relief if the Court considers that there is justification granting such relief based upon the material facts set out in the pleadings.[12] Section 36 of the District Court Act reads as follows:

> 36—Alternative forms of relief
>
> (1)    Although a particular form of relief is sought by a party to an action, the Court may grant any other form of relief that it considers more appropriate to the circumstances of the case.
>
> (2)    In particular—
>
> (a)    where a party seeks relief by way of injunction or specific performance, the Court may award damages in addition to or in substitution for such relief;
>
> (b)    where a party seeks foreclosure of the equity of redemption in mortgaged property, the Court may, instead of ordering foreclosure—

---

[9]    *Vordemeirer v Alguna* (No 3) (1997) 195 LSJS 472.

[10]    *Micarone v Perpetual Trustees* (1999) 75 SASR 1.

[11]    *SP Hywood Pty Ltd v Standard Chartered Bank Ltd* (SASC Perry J, S 3764, 21 December 1992, BC 9200151, unreported), *Battye v Shammall* (2005) 91 SASR 315.

[12]    *Cooper v Maloney (No 3)* [2012] SASC 153.

9

> (i)   direct the sale of the mortgaged property; or
>
> (ii)   direct a transfer of the mortgage debt and security to a person who agrees to assume the debt.

(This subsection is not exhaustive.)

24    This section operates upon questions of alternative forms of relief but it does not apparently affect the general rule,[13] that pleadings must establish the relief to which a party is entitled. At least inferentially, those pleadings must relate to the material facts pleaded which would justify the remedy provided as the relief given by the Court using this section.[14] Ordinarily, if the material facts are not contained within the pleadings, a Court would be disinclined to grant any further remedy apart from that which was made out on the pleadings. A matter made out on a pleading will include any matter which is admitted or deemed admitted.

25    It would therefore follow, by parity of reasoning, that the Court would not look to any external source of material facts in order to bolster the pleaded material facts within a statement of claim. As was expressed by Bowen LJ in *Young v Thomas* at page 137, any judgment must be entered on the basis of the pleaded case.[15]

26    A distinction may be made between the remedies sought and the relief sought and granted. In this case the relief sought is for damages as a consequence of the torts committed by the defendant and the plaintiff seeks to be put in the position as if the wrong had not been committed. The remedy sought is damages to be assessed and the question of the relief granted is a matter for the Court. It is necessary to emphasise the difference in these two things. In *Phonographic Performance Limited v Maitra*,[16] Lord Woolf MR at page 644 said as follows:

> Judgment on default is given upon the facts pleaded in the statement and claim ... and affidavit evidence to supplement or support those facts is not appropriate as the pleaded facts are deemed to be admitted.

I interpolate here that this approach is consistent with the approach required under the South Australian Rules. His Lordship went on:

> ... however, that cannot be rigidly applied where the judge has to exercise a discretion whether to grant relief sought. Where an injunction is sought, facts relevant to the grant of that injunction, which are not deemed to be admitted, should be brought to the attention of the judge by way of affidavit or otherwise. Further, if the judge is aware of matters relevant to the exercise of ... discretion, (the judge) can seek an appropriate explanation before coming to any decision ...

---

[13]   *Banque Commerciale SA v Akhill Holdings Limited* (1990) 169 CLR 279.
[14]   *Battye v Shammall* (2005) 91 SASR 315.
[15]   See *Dataline* at [48].
[16]   [1988] 2 All ER 638.

10

27          His Lordship was there distinguishing between the type of relief sought (for example declaratory relief or injunctive relief) where affidavit evidence may be received by the Court to assist in making that decision but not in order to supplement any facts pleaded.[17]

28          That approach is consistent with the decision of Lee J in *Watson Specialised Tooling Pty Ltd v Stevens*,[18] where his Honour, dealt with an unliquidated damages claim against a defendant who had failed to appear. His Honour held that the dilatory defendant was deemed to have admitted only the claims made against him and in an unliquidated damages claim to have admitted liability for the damages but not the quantum. The dilatory defendant in an unliquidated damages claim must be given the opportunity to address the Court again on the question of the quantum of the claim.

### The service of the further pleadings on the second defendant

29          The summons and statement of claim was served on Rejuvi in San Francisco USA on 25 September 2009 and by letter of 7 June 2013 in a letter sent directly to Rejuvi, the Court informed Rejuvi of the trial date set for the assessment of damages. The Court has given Rejuvi an opportunity to be heard on the question of the quantum of the unliquidated damages claims. I am satisfied that Rejuvi has not taken up the opportunity given to it by the Court.

30          Following the hearing before me for the assessment of damages, I raised with the plaintiff at a subsequent hearing before me on 13 October 2015 that there was no evidence before the Court that the second, third or fourth Statements of Claim had been served upon the defendant Rejuvi or that judgment had been sought in respect of the allegations set out in the fourth Statement of Claim which was the basis upon which the plaintiff sought her assessment of damages before me. On 13 October 2015 the matter was left with the plaintiff to give consideration to the way in which she wished to proceed and whether, for example, she wished to proceed on the first Statement of Claim or whether she wished for an assessment of damages to be made on some other and if so what basis.

31          The Court then received an application for permission to serve the second, third and fourth Statement of Claims upon the defendant Rejuvi. The Court was informed that the plaintiff requested the Court to assess her damages on the basis of the allegations set out in the fourth Statement of Claim and the response (if any) of the defendant Rejuvi to the allegations of fact and the claims set out in the fourth Statement of Claim. On 9 December 2015 I consequently gave leave to the plaintiff to serve the second, third and fourth Statements of Claim upon the defendants Rejuvi Laboratories Inc. in accordance with the Rules and Service of Process Regulations under the Hague Convention. On the same day, I ordered that the plaintiff's assessment of damages be stayed until service of the

---

[17]  See *Dataline* at [50].
[18]  (1991) 1 Qd R 85 at 93-34.

11

proceedings had been effected pursuant of the orders that I made so that the second defendant Rejuvi could be given a further opportunity to file any Notice of Address for Service in answer to the claims made under the fourth Statement of Claim.

32     The Court has now received and the plaintiff has read into evidence the fifth affidavit of Richard Gregory Eckermann (FDN72) sworn 24 March 2016 as well as the documents comprising FDN71. The documents in FDN71 are a Certificate of Attestation which identify that in conformity with Article 6 of the Hague Convention, the documents particularised therein have been served upon the second defendant on 28 January 2016 at 360 Swift Avenue STE.38 South San Francisco California USA 94080. Attached to the Certificate of Attestation is an affidavit sworn by Billi Pena, an authorised process server of San Francisco California USA sworn 19 February 2016. Attached to that affidavit is a California Jurat Certificate also dated 19 February 2016 which is a certificate of the Court identifying that it is satisfied that the persons swearing the affidavit, namely Billi Pena is the person who purports to be swearing the affidavit.

33     Relevantly the affidavit reads as follows:-

On the 28th day of January 2016 at 9.51am at the address of 360 Swift Avenue STE.38 South San Francisco, within the county of San Francisco, state of California 94080; this affiant served the above described documents upon Rejuvi Laboratories Inc. by then and there personally serving one true and correct copy(ies) thereof, by then presenting to and leaving the same with Amy Chaw, Clerk Person Authorised To Accept, who accepted service with identify confirmed by physical description, an Asian female approx. 25-35 years of age, 5 ft 6 in – 5 ft 8 in tall, weighing 140-160lbs with black hair.

No information was provided or discovered that indicates that the subjects served are members of the US military. It is in respect of that matter that the notary certificate entitled "California Jurat Certificate" executed by a Notary Public, Maricela Garay and dated the 19th of February 2016 refers.

34     From the contents of Court file document FDN71, I am satisfied on the balance of probabilities that on 28 January 2016 the following documents were served upon the second defendants namely:-

1     A sealed copy of the second Statement of Claim

2     A sealed copy of the third Statement of Claim

3     A sealed copy of the fourth Statement of Claim

4     The Tender Book (FDN61)

35     These are the documents described in FDN68 which, in accordance with the requirements of the Hague Convention, are the summary of the documents to be served prepared by the plaintiff and filed by her solicitors with the Court on 14 December 2015. These were the documents which were described in the

12

request for service abroad of judicial documents and the certificate of service filed with the Court comprising FDN69 dated 14 December 2015. That request was directed by this Court to the US Department of Justice Civil Division, Office of International Judicial Assistance, Benjamin Franklin Station PO Box 14360 Washington DC 20004 United States of America. I am also satisfied that this request was forwarded to the American authorities under the Hague Convention on 16 December 2015 under cover of letter from this Court to ACABC Legal – Process Forwarding International, Corporate Headquarters 633 Yesler Way Seattle WA 98104 USA.

36      The affidavit of the solicitor Mr Eckermann sworn 24 March 2016 (FDN72) discloses that the Form 14 summary of documents served advises the defendant Rejuvi that if Rejuvi wishes to be heard on the plaintiff's assessment of damages, it was required to file a Notice of Address for Service in the District Court of South Australia within 42 days of the service of the documents upon it. That period of 42 days expired on 10 March 2016. I am satisfied that no Notice of Address for Service has been filed since the date of service of the documents upon the second defendant on 28 January 2016. I am therefore satisfied that the plaintiff is at liberty to ask the Court to sign judgment against the second defendant Rejuvi and to request the Court to assess damages based upon that judgment.

37      It was not until 27 May 2016 that the plaintiff filed in this Court an application for entry of default judgment against the second defendant pursuant to r 229 of the Rules of Court. I am satisfied that on 27 May 2016, the Court Registry informed the plaintiff that following her administrative application, judgment has been entered into the second defendant. By affidavit dated 26 May 2016 (FDN73), the plaintiff has informed the Court that it requests the Court to proceed to assess damages on the material before the Court, being the same material that has already been served upon the second defendant Rejuvi and in accordance with previous submissions placed before the Court on behalf of the plaintiff against Rejuvi. I remain satisfied that there is no requirement under the Rules of Court that the second defendant be put on notice that the plaintiff intended to obtain that judgment in default of the appearance or a Defence and that I am now in a position to proceed to assess damages in this matter based upon the content of the claims of the plaintiff in the fourth Statement of Claim. I will deal with those matters below and I will refer to the allegations in the fourth statement of claim as "the statement of claim".

38      In the statement of claim, the plaintiff alleges that her injuries were caused by the negligence of the first and or second defendants because they:-

1.      Failed to include warnings on the products promotional materials of burning, infection and scarring that could be caused by either the correct or incorrect application of the products;

2. Failed to advise, train or otherwise inform the persons to whom they sold the product and by extension apply it, in this case Ms Babich and Platinum Beauty of the matters in 1 above;

3. Failed to include warnings on the website of the second defendant and then (wrongly) made reference to benzoic acid as a natural ingredient and food additive, therefore implying it was safe;

4. Provided the plaintiff with a brochure (disseminated by the second defendant) notwithstanding the incorrect statements that the product was safe and would not cause side effects;

5. Failed to consider the brochure could be misleading and could falsely reassure the plaintiff; and

6. Failed to set out in a document a recital of the risks of the products (which was eventually given to distributors in April 2008).

39    The material facts that are disclosed on the statement of claim and which are accepted as proved in this matter are as follows:-

FOURTH STATEMENT OF CLAIM

Part 1:

The causes of action, on the basis of them and the material facts are:-

1. The plaintiff is a female born the 9th day of October 1970.

2. The first defendant is and was at all material times a company duly registered in Australia pursuant to the Corporations Law and in its capacity of trustee of the J&M Titeica Family Trust operated a business which, inter alia, was the sole importer into Australia from the United States of America and distributor within Australia of consumer products of the second defendant and traded with the name "Rejuvi Australia".

3. The second defendant is and was at all material times a company incorporated in the United States of America whose business includes the production and distribution of various products to overseas countries as well as within the United States of America.

4. The third defendants were at all material times the owners and operators of a business in North Adelaide, South Australia, providing skin care and beauty services under the name "Platinum Beauty".

5. Further, or in the alternative, the third defendants held out to the public, including to the plaintiff, that they were the owners and operators of the business "Platinum Beauty" by way of the registration of the business name "Platinum Beauty" to them.

6. Further, or in the alternative, the fourth defendant was at all material times the owner and operator of a business in North Adelaide, South Australia, providing skin care and beauty services under the name "Platinum Beauty". The third and fourth defendants herein will be otherwise referred to as "Platinum Beauty".

14

7. At all material times the plaintiff had tattoos on her back and right ankle.

7A. Immediately following the treatment Ms Babich provided the plaintiff with an aftercare sheet advising about how to manage the area treated by the paste. The sheet referred to infection and was told that the possibility of infection was a worst case scenario and it would not apply to the plaintiff. The sheet did not refer to either burns or nerve damage.

8. In or about September 2007 the plaintiff became aware of a new form of treatment for the removal of tattoos, through the application of a product known as "Rejuvi Tattoo Ink Extraction Paste" ("the paste").

9. The paste was a product registered to and produced by the second defendant and imported into Australia from the United States of America by the first defendant for the purpose of onward sale to retailers and (ultimately) the public and was then subsequently provided to Platinum Beauty.

9A. The paste contained the chemical triethanolamine ("TEA") at the level of 7%.

10. The plaintiff attended a clinic with respect to the possibility of the use of the paste for removal of her tattoos in early September 2007. The clinic advised her that they did not have experience in the use of the paste and the plaintiff declined their services.

11. On 18th September 2007 the plaintiff attended at Platinum Beauty and was seen by Michelle Babich. The plaintiff was told by Ms Babich that she had training in the use of the paste and had experience in applying the paste. The plaintiff was shown various "before and after" photographs in a medium size black photo album which she was told were examples of the use of the paste by Ms Babich. Ms Babich advised the plaintiff that the product was safe and that there were no side effects of the treatment other than itchiness or other minor irritation for a small number of days. Ms Babich did not advise that the product included benzoic acid. On the basis of the information provided by Ms Babich the plaintiff consented to being treated with the paste by Ms Babich for a fee payable to Platinum Beauty.

12. The representations and information provided referred to in paragraph 11 herein formed implied terms in the contract between the plaintiff and Platinum Beauty to apply the paste.

13. On or about the 27th September 2007 the plaintiff had the paste applied to her tattoos by Ms Babich pursuant to the contract referred to in paragraph 12 herein ("the treatment"). Prior to the treatment Ms Babich did not disinfect the plaintiff's skin, nor did Ms Babich place sterile dressings on the affected areas following the treatment. The plaintiff was not required to read or sign any consent forms or make any declarations about her medical condition.

13A. Immediately following the treatment Ms Babich provided the plaintiff with an "after care sheet" advising about how to manage the area treated by the paste. The plaintiff was concerned to note that the sheet referred to infection and asked Ms Babich why this had not been noted before. Ms Babich responded that this was a "worst case scenario" and would not apply to the plaintiff. In any event, the sheet did not refer to either burns or nerve damage.

14. Immediately following the treatment the plaintiff noted increasing pain and within 24 hours, intense pain. The skin surrounding and over the tattoos had become burnt (up

to third degree burns) and raised. The plaintiff carried out the after care procedures recommended by Ms Babich in the sheet referred to in paragraph 13A. The areas of skin on her ankle which were covered in the paste became infected and the infection was subsequently treated by antibiotics. The plaintiff suffered an injury including burns to her back and ankle and nerve damage to her ankle for which she has required medical treatment including surgery and will require further treatment and been left with scarring and other injuries, particulars of which are set out below.

14A.  In early October 2007, after the adverse reaction referred to in paragraph 14 herein, the plaintiff contacted the first defendant's office by telephone on several occasions and spoke to a Ms Titeica. During these conversations the plaintiff advised of her adverse reaction to the paste and was told by Ms Titeica that the first defendant was the importer of the paste, that the product was safe, very successful around the world. The plaintiff asked if there was any history of problems with the paste in the past and Ms Titeica denied that there had been any complaints and advised that the paste contained only natural ingredients. Ms Titeica further stated she did not believe the paste could have caused the reaction. The plaintiff queried who was performing the procedure and was advised that businesses with the names of "Tattoo You", "Platinum Beauty" and "Accents on Beauty" were performing the procedure. Ms Titeica advised that she would send a brochure and some Rejuvi cream to the plaintiff. The plaintiff received the brochure in early October 2007, however did not receive any cream. The brochure had a business card attached and stated, inter alia, with respect to the paste, "safe- no side effects"("the brochure") The plaintiff noted that the information on the brochure regarding the procedure, namely that it was "safe" with "no side effects" was identical to the advice provided to her by Ms Babich prior to the procedure being undertaken.

14B. The plaintiff again contacted Ms Titeica of the first defendant in or about early October 2007 and advised of the receipt of the brochure. In these conversations, Ms Titeica advised the plaintiff that she had contacted Rejuvi in the United States to confirm that the product only contained natural ingredients and that they had never had any previous complaints. Ms Titeica asked for photos of the problem and suggested she return to the technician as the problem must have been with her.

14C. The plaintiff then spoke to Dave Rosprim, stated to be the marketing director of the second defendant and it was repeated to her that the paste was safe and contained natural ingredients. However, Mr Rosprim also advised that the paste was no longer sold in the USA.

14D.  The brochure was subsequently removed from circulation, by at least 2010.

14E. The plaintiff checked both the Australian and the United States Rejuvi websites in or about November 2007 and determined there were no warnings noted regarding the use of the paste. Warnings were later included on the Australian website and were seen by the plaintiff in or about August 2008. The references to the paste are no longer on the United Stated website.

14F.  The first and second defendants are no longer holding training sessions for the use of the paste in Australia or actively promoting the use of the paste in Australia.

15. Following the treatment the plaintiff became aware that there was a prior history of adverse reactions to treatment with the paste, including:

15.1 Litigation in California from a plaintiff (Tracy Janos) who alleged a similar adverse reaction to application of the paste in 2001;

15.2 Various reports of scarring and burns from named and unnamed patients on internet forums relating to the paste;

15.3 Review in a 2008 dermatology publication making reference to prior history of burns and scarring from use of the paste;

15.3A A discussion with David Rosprim, marketing director of the second defendant and the plaintiff by telephone in or about November 2007 where he advised that the paste was not being used in the USA, despite being quoted in a "Medill" newspaper article on the 23rd April 2003 that there had been no complaints about the paste;

15.4 The plaintiff will seek discovery of further information known to the defendants of scarring and burns if the history of adverse reactions is denied.

16. The plaintiff further determined following the treatment that Michelle Babich did not have the experience alleged at paragraph 11 herein and in particular that the "before and after" photographs she was shown were photographs released by the first and/or second defendant and not treatment provided by Ms Babich. In discussions between Ms Babich and the plaintiff in or about October 2007, Ms Babich maintained to the plaintiff that she was told the ingredients were "safe" and "natural" in her training with Mr Cheng in Sydney. Ms Babich showed the plaintiff a further copy of the brochure referred to in paragraph 14A herein and advised she was not told of any side effects.

17. Had the plaintiff known that the paste had a history of adverse reactions, or not been advised that the product was "safe" with "no side effects", the plaintiff would not have undergone the treatment.

18. Had the plaintiff known that Ms Babich had not performed the treatments she referred to or had limited history in the use of the paste, the plaintiff would not have had the treatment performed by Platinum Beauty.

### _Negligence_

19. By reason of the matters pleaded above the injury to the plaintiff was caused by the negligence of the first defendant and/or the second defendant in that the first defendant and/or the second defendant:-

19.1 Failed to include in their promotional and advisory material to be provided to potential clients that the paste can cause burning, infection, scarring and like injury with either correct or incorrect use of the paste by the person applying it;

19.2 Failed to advise, train or otherwise inform the persons to whom they sold the paste or who would or may become responsible for applying the paste of the potential for adverse reaction as set out above;

19.3 Failed to supply internet based advice on its website or otherwise of the potential of the adverse reactions referred to herein to the use of the paste, and in reference to the ingredients of the paste refers to benzoic acid as a natural ingredient and food additive, representing that it is safe;

19.4 Provided the plaintiff with the brochure referred to in paragraph 9A and 14A herein despite the fact that its contents were untrue in that the paste was not safe to all persons and the paste could cause side effects;

19.5 Failed to consider whether the provision of the brochure referred to in paragraph ~~9A and~~ 14A may cause persons including the plaintiff to be falsely reassured about the risk and likelihood of an adverse reaction to the paste;

19.6 Subsequently (from about April 2008) provided its distributors with documents called "medical condition form" and "release agreement form" and "consent form" advising of potential risks of the use of the paste when such documents should always have been provided to better inform the public of the potential risks of the use of the paste.

### *Misleading and Deceptive Conduct and Representations – Fair Trading Act*

20A.  The plaintiff repeats paragraphs 1 to 19 (inclusive) herein.

20.  Further, or in the alternative, the first defendant in the production of the promotional material supplied to Platinum Beauty and provided to the plaintiff herein engaged in conduct that was misleading and deceptive, or in the alternative made representations which were likely to mislead or deceive the plaintiff, in that the plaintiff was not made aware of the possibility of long term injury, scarring or burning from the application of the paste, in breach of sections 56, 58(a), 58(e) 63 and 64 of the Fair Trading Act 1987 (SA).

21.  Further, or in the alternative, Platinum Beauty through Michelle Babich and/or Michelle Babich personally made representations which were likely to mislead or deceive the plaintiff, in that the plaintiff was not made aware of the possibility of long term injury, scarring or burning from the application of the paste and made representations that Ms Babich had experience in the application of the paste and had undertaken the treatment referred to in paragraph 16 herein when the same was not true, in breach of sections 56, 58(a), 58(e) 63 and 64 of the Fair Trading Act 1987 (SA).

### *Negligence / Breach of Contract*

22.  The plaintiff repeats paragraphs 1 to 19 (inclusive) herein.

22A      Further, or in the alternative, the injury caused to the plaintiff was caused by the negligence and/or breach of contract of Platinum Beauty and/or Michelle Babich personally and the plaintiff repeats the allegations set out in paragraph 21 herein and further states that Platinum Beauty by Ms Babich and/or Michelle Babich personally failed to properly apply the paste to avoid injury to the plaintiff or reduce the prospect of injury to the plaintiff, including that Ms Babich failed to sterilize or properly sterilize the plaintiff's skin prior to the treatment or place sterile dressings on the plaintiffs skin following the treatment and that Platinum Beauty by Michelle Babich and/or Michelle Babich personally failed to possess the skills and training required for the effective administration of the paste.

### *Manufacturers Warranties Act*

22B.      The plaintiff repeats paragraphs 1 to 19 (inclusive) herein.

22C.      The paste was manufactured goods within the meaning of *the Manufacturers Warranties Act 1974 (SA)(*"the said Act*").*

22D.      The plaintiff was a consumer of the manufactured goods within the meaning of the said Act.

22E.     The paste was imported into Australia by the first defendant from the second defendant who at all relevant times did not have a place of business in Australia.

22E.     On or about the 27th September 2007 in the State of South Australia the plaintiff purchased the paste from the third and fourth defendants by way of contract and sale by retail between the plaintiff and Platinum Beauty to apply the paste to the plaintiff for a fee payable to Platinum Beauty.

22F.     The paste was imported into Australia from the United States of America by the first defendant from the second defendant who at all relevant times did not have a place of business in Australia.

22G.     Accordingly the first defendant was at all material times the manufacturer of the manufactured goods within the meaning of the said Act and therefore owed the plaintiff a statutory warranty pursuant to s.4(1)(c) of the said Act that the goods were of merchantable quality.

22H.     By reason of the matters set out above the paste was not of merchantable quality in that it was not fit for the purpose for which goods of the kind are ordinarily purchased as it was reasonable to expect having regard to:

22H.1 the description applied to the goods by the manufacturer;

22H.2 the price received by the manufacturer for the goods;

22H.3 the goods being in the nature of therapeutic goods;

22H.4 the burns and nerve damage sustained by the plaintiff as a result of the application of the paste.

22I.     The first defendant in breach of an express warranty and statutory warranty is liable to the plaintiff for damages pursuant to s. 5 of the said Act.

### *Trade Practices Act*

23. The Plaintiff repeats paragraphs 1 to 19 (inclusive) herein.

24. Further the Plaintiff claims as against the first defendant that:-

24.1   The Paste was manufactured by a corporation engaged in trade or commerce in the United States of America, namely Rejuvi Laboratory Inc;

24.2   The Paste was imported from the United States of America into Australia by the first defendant and supplied by the first defendant to the Third and Fourth Defendants;

24.3   The Paste was defective as a product to safely remove tattoos;

24.4   By reason of the defective nature of the Paste, the plaintiff has suffered personal injuries, loss and damage when it was applied to her skin by the Third and Fourth Defendants;

24.5   The First Defendant is deemed pursuant to section 75AB of the Trade Practices Act 1974 and in respect of any claim made pursuant to Part VA of such Act to be the manufacturer of the Paste.

24.6   The First Defendant is liable pursuant to section 75AD of the Trade Practices Act 1974 to the plaintiff for the injury sustained by her.

### *Personal Injury, Loss and Damage*

25   As a consequence of the treatment the plaintiff suffered personal injury, loss and damage, particulars of which are as follows:-

25.1 The plaintiff had immediate and increasing pain following the treatment and sought medical advice. The plaintiff required creams and antibiotics to reduce immediate pain. The plaintiff spent some weeks with severely limited movement.

25.2 The plaintiff has subsequently required treatment including surgery to deal with scarring and burns at the site of the right ankle tattoo and the tattoo to her back and to deal with a peroneal nerve entrapment in her right leg. The plaintiff has undergone six operative procedures and has been left with residual scarring, irritation and radiating pain in her right leg.

25.2.1 The plaintiff has further been diagnosed with a cystic nephroma of the left kidney, otherwise known as a Bosniak 2F left renal cyst, measuring 40mm in length. The Plaintiff has been advised that a cyst of this nature carries a 5-10% risk of malignancy. The Plaintiff has further received medical advice that this type of kidney tumor is rare and that it is likely to have resulted from the exposure to TEA through the application of the Rejuvi paste.

25.3   The plaintiff requires further treatment and at the date of these particulars is awaiting advice as to treatment of permanent peroneal nerve damage and nerve compression adjacent to her right ankle and leg, caused during the treatment. The plaintiff has been left with residual scarring to her back.

25.3.1 The plaintiff requires ongoing monitoring of the kidney lesion for any changes or disturbances in size. The monitoring will encompass MRI scans, CT scans and future ultrasounds.

25.4  The plaintiff suffered a psychological reaction including depression and post traumatic stress disorder as a consequence of the treatment, which has required assistance of a psychologist. The plaintiff has continued suffering from emotional distress and anxiety including panic attacks.

25.5  Further particulars of the plaintiff's pain and suffering will be provided in the Statement of Loss to be filed in this action. The plaintiff's pain and suffering includes burns to her right ankle and back, kidney lesions, psychological trauma including post traumatic stress, anxiety and depression, restricted use of her right leg, nerve damage as set out in paragraph 23.3 herein, ongoing daily pain and scarring.

25.6 As a result of the negligence and/or breach of contract and/or breach of statutory duty of the defendants the plaintiff has suffered a loss of earning capacity. At the time of the treatment the plaintiff was not working as a consequence of prior difficulties with chronic fatigue syndrome but was close to being able to return to full or part time work. As a consequence of the treatment the plaintiff has not as yet been able to return to work as a consequence of the ongoing pain and trauma and the requirement for surgery. The plaintiff will not be able to return to work due to the physical and psychological consequences of the treatment until after her treatment concludes and will have permanent difficulties with full time work as a consequence of the psychological trauma and ongoing nerve damage.

25.7 The plaintiff has required voluntary care as a result of her injuries by way of assistance with domestic activities including house work and gardening and some self care, particularly in the periods following the treatment and later surgery required as a consequence of the treatment. The plaintiff will require ongoing care and assistance in the future.

25.8 The plaintiff has incurred special damages in the form of medical expenses, medication and ongoing treatment including operative treatment, scans, physiotherapy treatment and psychological treatment, full particulars of which will be provided in the Statement of Loss to be filed in this action. As a result of the injuries the plaintiff will require further treatment including further surgery, ongoing monitoring by doctors, medication and the like.

25.9 The plaintiff has suffered and will continue to suffer a loss of enjoyment of the amenities of life.

**Part 2:**

The remedies sought are:-

1.     Damages against the first defendant for negligence and/or damages for breach of statutory warranty pursuant to s.5 of the Manufacturers Warranties Act and/or damages pursuant to section 75AD of the Trade Practices Act and/or damages for breach of statutory duty pursuant to s84 of the Fair Trading Act given the position of the first defendant as a supplier of medical services.

2.     Damages against the second defendant for negligence including punitive (exemplary) damages given the position of the second defendant as a supplier of medical services and the contumelious disregard shown of the risk of injury to the plaintiff, particularly in light of the fact that it had previously been made aware of the adverse effect of the Rejuvi paste product on other persons treated with it (as referred to in paragraph 15.1) and it contains the dangerous chemical TEA in a high dosage of 7%.

3.     Damages against the third and/or fourth defendant for negligence and/or damages for breach of statutory duty pursuant to s84 of the Fair Trading Act and/or damages for breach of contract.

4.     Interest

5.     Costs

40        In accordance with the interlocutory orders made in this Court, I have proceeded to hear the assessment of damages claimed by the plaintiff on the basis which I have set out above. The assessment of damages is limited to the matters raised within the material facts disclosed on the face of the statement of claim which I have set out above. In accordance with the principles that I have discussed above, I am able to provide a remedy to the plaintiff both as sought and as they arise on the material facts as pleaded in accordance with any opinion that I form. However, as will become apparent from the discussion post, the remedies and relief sought by the plaintiff within the Statement of Claim are the only remedies available to her against the second defendant based upon the

21

admissions of the second defendant arising from its failure to file any answering material to the Statement of Claim of the plaintiff.

41      In the course of evidence, I received a number of exhibits all of which I am satisfied are relevant to the issues raised and pleaded in the Statement of Claim. They now form part of the evidentiary basis before me on the assessment of damages. I will set out hereunder that information which I consider to be relevant and admitted by virtue of the factual matters reflected in the Statement of Claim.

42      Paragraph 25.6 of the Statement of Claim pleads a claim for a loss of earning capacity and refers to a background of difficulties with chronic fatigue syndrome and a recovery, in part, from that condition. The plaintiff then pleads the effect, in the future, of the physical and psychological consequences of the injuries and the treatment consequential upon such injuries in the background of having previously suffered from chronic fatigue syndrome. In order to make an assessment of those claims, it is necessary for the Court to receive information about the plaintiff from which it may make its own assessment about the plaintiff's prospects of employment. As will become clear, I have received evidence from the plaintiff in support of these claims made by her in relation to her employment and I have assessed them on the basis of the information that is properly before me. I will make adjustments I consider appropriate in the circumstances disclosed on the evidence before the Court.

43      I am satisfied on the whole of the material before me that Ms Corso is entitled to an assessment of damages for loss of earning capacity and I will deal with that assessment below.

44      Ms Corso was educated to year 11 level in high school and then undertook a Certificate in Business. She worked as a law clerk and then obtained employment as a bank teller in 1988. She was promoted to the role of Branch Supervisor at another bank and in 1992 achieved the more senior role of Branch Manager. In that time she partially completed an associate Diploma in Banking and Finance. There is no detail in the evidence about the level of skill or learning that she attained. In 1993, she became a Bank Supervisor Relieving Bank Manager. A clear inference arises on balance that this is a more senior role in the bank and marks the rise of Ms Corso through the banking hierarchy. In 1998, because of ill health which was later diagnosed as chronic fatigue syndrome (but not then diagnosed), Ms Corso commenced work in the retail field in a department store and then in telecommunications companies. In 2003 Ms Corso was diagnosed with chronic fatigue syndrome and was off work for a period of some three to four years until the latter half of 2007. From that time, the plaintiff did not obtain further employment.

45      In early September 2007 the plaintiff made a decision to remove the tattoos that she had on her right ankle and her back. The tattoo on the right ankle, on the distal side, measured about 4cm in length and breadth. The tattoo on the plaintiff's back measured about 35cm in length.

*[2016] SADC 62*

22

46      On 18 September 2007 the plaintiff attended at the premises of Platinum Beauty Clinic in North Adelaide and spoke to a Michelle Babich who informed her that she had been trained in the use of the Paste and that she had experience in the application of the Paste. The plaintiff was shown photographs in a brochure distributed by the second defendant which showed "before" and "after" pictures of people who had undertaken or were undertaking this procedure. Those photographs may be described as indicating an almost flawless result with the brochure also asserting that the results were safe, were effective, quick, simple and easy to obtain. Based upon that information and material and relying upon it as well as everything that she had been told about it, the plaintiff decided to undergo the procedure which occurred on 27 September 2007. I am satisfied that as a matter of common sense and experience, reliance by the plaintiff upon the material prepared and disseminated by the second defendant has been established. It also follows that a causal connection has been established between the actions and conduct of the second defendant and the decision made by the plaintiff and its consequences.

47      Following the procedure, the plaintiff suffered the consequences as have been set out in the Statement of Claim. Following a period of adverse skin reactions, she attended her General Practitioner and was referred to an emergency clinic of a city based hospital for further examination by a Plastic Surgeon. She was advised that she would require plastic surgery to treat what were described as chemical burns to her right lower ankle and back. Since the time of her initial consult with the Plastic Surgeon, she has undergone five separate surgeries in an attempt to resolve the injuries. The first three were required to excise the scars on her right ankle and back. The fourth surgery was upon the back and the fifth further surgery upon the ankle. As a result of the first three surgeries, the plaintiff suffered a peroneal nerve neuroma and the fifth surgery was performed to explore and treat the right superficial peroneal nerve neuroma. The peroneal nerve neuroma has caused nerve pain because of inflammation of the nerve resulting in a burning and throbbing sensation from the lower part of the right foot through the right leg to the spine.

48      The plaintiff is left with scars of approximately 7cm of the right ankle and 35cms along her back which are disfigured and unsightly.

49      As a result of the sequelae of the surgery, the plaintiff was unable to do housework as any overuse of her leg would aggravate her condition and has obtained assistance with household chores from her sister. She is unable to do most household chores because of the pain resulting from pressure on her legs and back. She is also restricted in her abilities to do basic grocery shopping and meal preparation because of pain associated with prolonged standing and bending and exerting pressure on her right leg. She has obtained assistance for domestic services.

50      The plaintiff takes 3-4 pain killer tablets per day comprising either oxycodone, Panadeine Forte and amitriptyline. The consumption of medication has affected her ability to sleep, to think clearly and to operate within normal limits. Her leg injury has affected her ability to bear weight on her lower right leg and she has developed a pronounced gait.

51      As well as the physical injuries that she has suffered, the plaintiff is also suffering from a psychological injury and she has been diagnosed with Post Traumatic Stress Disorder with Severe Depression and Anxiety. She experiences panic attacks during which time her heart races and her breathing rate is increased. As a result of these injuries, her functioning and quality of life have been greatly affected. She is now forced to live with chronic neuropathy pain syndrome relying on 3-4 pain killers per day and she is prevented from playing any sports, exercising, doing housework, gardening, lifting heavy objects or wearing fashionable shoes. She bulk buys medication and spends an average of about $15 Panadeine Forte every six months and $5.60 on antidepressant medication monthly. She is on a mental health care plan for psychological treatment which covers about 10 sessions in a calendar year.

52      The plaintiff says that she is now unable to return to paid work even though she had been out of the workforce for about 4 years prior to these events. Her inability to rejoin the workforce is as a result of the combination of physical and psychological factors including the psychological effects of panic attacks and anxiety which commenced in about 2008.

53      As a result of the injuries suffered, the plaintiff is unable to form relationships due to both physical and psychological factors. She has felt for that time that she could not have an ordinary relationship with her peers but also she is unable to maintain her relationships with her family and friends. She feels like she is a burden to her family because she is constantly asking for assistance in the work that she does.

54      At the time that she undertook the treatment, the plaintiff had no understanding, belief or notion that she would suffer any adverse effects of the use of the Paste. She was not shown any adverse information about the procedure, she was not given any warning of any side effects or health risks linked to the procedure and she was told that it was a safe and fantastic product which had enjoyed great success in Australia and overseas. The same style of information was also set out in the brochure that she was given. She was made to understand that her skin would be left with "pre-tattoo condition" and that the procedure was highly effective and simple. She did not ever imagine that she would be left with burns and scarring, that the procedure would impact on her quality of life so significantly nor that it would produce the adverse effects that she has suffered. The plaintiff says that she would never have undergone the procedure had she been made aware of the risks and adverse effects involved in undertaking the procedure. I accept the plaintiff's evidence on that topic.

24

## Medical evidence

55  It is necessary that I summarise the relevant medical evidence in relation to both the psychological and physical injuries suffered by Ms Corso.

### *Psychological injuries*

56  Professor Cherrie Galletly is a Consultant Psychiatrist. She produced a report dated 19 July 2008. After discussing the history of the plaintiff, at page 3 of the report Professor Galletly said as follows:-

> Ms Corso suffers from Chronic Fatigue Syndrome which began about 10 years ago. After leaving school, she worked in banking for some 10 years. She was branch supervisor and relieving manager at the bank. She subsequently did some temping for an agency but because of the chronic fatigue she has not worked for the last three years. The Chronic Fatigue Syndrome is improving, but the strain of the failed tattoo removal and subsequent surgery meant that she had an exacerbation of the Chronic Fatigue Syndrome for a couple of months about three months ago.
>
> Mental State Examination
>
> Ms Corso presented as a pleasant young woman who related well and gave a detailed history. She was clearly anxious and distressed at describing the experience of the attempted tattoo removal and subsequent surgery, scarring and discomfort.
>
> She has a scar some 5-6cms long over the lateral aspect of her right ankle where the tattoo removal took place and a patch of discolouration due to a persisting edge of the tattoo along with some lumpiness around the scar.
>
> Conclusions
>
> Ms Corso meets criteria for an Adjustment Disorder with Mixed Anxiety and Depressed Mood, Chronic (DSM-IV-TR Code 309.28). She has also suffered an exacerbation of the pre-existing chronic fatigue syndrome which may be related to the stressors described above.
>
> She should continue to receive treatment from her psychologist… her condition is not stable and further review should be undertaken once she has completed all required surgical procedures and the psychological treatment.

57  Professor Galletley recommended ongoing treatment from Ms Corso's psychologist Ms Forrester, and suggested a review once that treatment has been completed. There is no further medical evidence from Professor Galletley before the Court.

58  Ms Glenys Forrester's report dated 27 July 2008 details the severe range of depression and extremely severe range of anxiety and stress which Ms Corso suffers. Ms Forrester recommends fortnightly sessions of treatment for six months followed by one session every three weeks for a further six months. The Court has not been advised as to whether this treatment has been completed by Ms Corso. I will deal with the costs associated with this recommendation when I deal with the future medical expenses section of this judgment.

25

### *Physical injuries*

59      Mr Paul Carney Neurosurgeon provided a report dated 9 October 2012 in relation to the plaintiff's neurological condition. Mr Carney reported that Ms Corso had suffered significant pain from the time of her treatment. He said that throughout the whole period after the application of the Paste, the pain in her ankle and foot persisted and was very much the same pain that the plaintiff had first felt when the needle went into her leg during the application of the treatment. He reported that the pain felt by the plaintiff began to work its way up the right leg and ran up the anterior shin to the thigh and then towards the buttock on the right hand side. She has continued to suffer pain as well as burning and aching that was described as feeling like an electric shock like lightening running up her leg.

60      Mr Carney reported that an ultrasound of the plaintiff's right leg demonstrated a neuroma in the region of the scar. Mr Carney agreed that there had been a severe inflammatory reaction to the treatment of the right ankle and agreed with a diagnosis made by Dr Peter Stavrou, Orthopaedic Surgeon made on 12 October 2010 that the plaintiff had suffered damage to her right superficial peroneal nerve.

61      In his summary of findings, Mr Carney said as follows:-

In the incident which occurred on 27 September 2007 Ms Corso had a local anaesthetic cream applied and then a paste, in the area of a tattoo above and over the lateral mallelous of the right foot. This area was then needled repeatedly.

Immediately subjacent to the skin in this area run branches of the superficial peroneal nerve.

The agent used was sufficiently toxic so as to cause extensive scar formation and an extensive skin scab following needling of the agent into the skin.

Ms Corso describes pain during this procedure and continuing following it with gradual expansion of the pain upwards in the right leg, thigh and buttock.

Neurological evaluation suggests damage to a branch or branches of the superficial peroneal nerve and ultrasound confirming an 11mm neuroma of the intermediate dorsal cutaneous branch of this nerve which is 11mm long. Both the ultrasonographer and my own evaluation findings indicate the presence of a tender neuroma at this point with reproduction of pain. I consider it probable that an agent sufficiently toxic so as to produce the degree of reaction seen in the skin, if injected into the region of a superficial cutaneous nerve, would produce damage sufficient so as to lead to neuroma formation and pain responses.

A prolonged period of implemation particularly with associated damage to a peripheral nerve of a chemical nature has led to a chronic pain syndrome to which repeated surgeries and the very prolonged course of treatment have contributed.

The spread of pain upwards and the intensity of the pain strongly suggests sensitisation of central (spinal cord root entry zone in the main) structures with wider radiation of pain. This will not respond to local treatment of the neuroma. It possibly might respond to

peripheral nerve stimulation but I consider the option of spinal cord stimulation probably represents a more reliable prospect for controlling the pain once full pain unit evaluation has been carried out.

62      Later in the same report, Mr Carney expressed the following opinion:-

Ms Corso as a result of the nerve injury and pain is unable to:-

(a) Work;

(b) Stand or walk for long periods;

(c) Wear high heeled shoes for long periods of time;

(d) She has a limited capacity of bearing weight on her right foot but nevertheless can walk more or less normally;

(e) Alleviation of pain should considerably reduce the impact of her injuries in the above areas.

6. (a) it is extremely difficult to evaluate pain which necessarily is a subjective problem which involves the peripheral nociceptor and the person aware of it. Nevertheless the type of pain she experiences is not inconsistent with a peripheral nerve injury of this nature and the history surrounding it.

(b) I consider the nerve pain is the factor which affects her ability to walk, stand for long periods, exercise and socialise.

(c) As indicated above, I consider pain unit evaluation and unless some conservative regime can be found which very significantly alleviates her pain, the consideration of peripheral nerve or spinal cord stimulation.

7. I consider that she does have permanent residual injuries as a result of the application of paste to her tattoos and the injection of that paste into the damaged peripheral nerve. This has very significantly damaged her quality of life at this stage.

63      In 2008, in the publication by the American Society for Dermatologic Surgery, an article was published entitled "Hypertrophic Scar after chemical tattoo removal". The article was authored by Drs Sainir et al. The article considered several cream removal systems introduced into the market for the removal of tattoos. They are described as follows:-

These consists of chemicals that penetrate the skin and gradually digest the tattoo pigments.

64      The authors then go on to say that the most recent form of chemical method developed uses chemicals introduced into the skin through tattooing needles. It is known as Rejuvi Tattoo Removal System. It reports that:-

A study of 98 patients by Cheng (also the founder of the company marketing this removal system) reports a 100% success rate for removal of cosmetic facial tattoos and 92% for body tattoos. Side effects are reported to be minimal, with a 0% scarring rate for cosmetic facial tattoos and a 6% for body tattoos and no associated pigmentory changes. The

proponents of this modality of tattoo removal suggests that it is more effective, safer, simpler and more cost effective than any other methods such as laser if performed by a skilled technician.

65    Having stated the claims by Dr Cheng, the founder and promoter of the company which produces the Rejuvi Paste, the authors then go on to say:-

Herein, we report a patient who developed hypertrophic scars after treatment with this chemical removal system.

66    The authors then discuss the case of a 27 year old man who presented to their clinic for treatment of scars after treatment with the Rejuvi System. The patient described the treatment as more painful than the initial tattooing and reported that the treated areas had become red and angry looking one to two days after each treatment session, but the practitioner reassured him that this was an expected response and therefore continued. The patient subsequently developed hypertrophic scars in the area using the Rejuvi product. It is to be noted that this is almost precisely the same experience of the plaintiff.

67    After discussing the chemical content of the Paste, the authors compared the claims by Cheng in relation to patient satisfaction with the scarring suffered by the patient in question. They summarised their views as follows:-

Despite severe scarring, our patient experienced a significant amount of pigment removal. It is difficult to say why our patient experienced such severe complications with a system, but close treatment intervals, weekly rather than monthly, as per manufacture, might have contributed to a prolonged inflammatory response, resulting in hypertrophic scars.

68    The authors then said that from their experience, when using the Rejuvi System, the risk of scarring seems to be more common with non-facial tattoos. Physicians treating tattoos should be aware of these tattoo dissolving procedures and be prepared to counsel patients on the risks and benefits.[19]

69    On 22 April 2001, Tracey Janos commenced a proceeding against the second defendant in the Circuit Court of Cooke County, Illinois County Department Law Division in Action No. CCG-67 (2-81). In the complaint, Tracey Janos pleads that the second defendant sold and distributed for sale its ink extraction system throughout the United States of America including the State of Illinois. She alleges that the system was defective and unreasonably dangerous in that it required an inappropriately sized needle to repeatedly puncture the skin, inserting non-pigmentory inorganic substances in a paste-like form thereby causing scarring to the recipient. The defective and unreasonably dangerous condition existed at the time that the defendant, (the second defendant in these proceedings), provided the product and at the time that it was used. As a consequence of the application of the product and as a consequence of the defective and unreasonably dangerous condition of the system, Ms Janos suffered

---

[19] Dermatologic Surgery: November 2008 pages 1599-1601 (©2008 by the American Society for Dermatologic Surgery Inc published by Wiley Products).

[2016] SADC 62

28

adverse skin consequences and scarring, pain and suffering and disability/loss of a normal life and disfigurement. In endeavouring to receive subsequent medical care, the plaintiff has incurred medical expenses. Ms Janos pleads that the second defendant in these proceedings, the defendant in the Illinios proceedings, was in breach of its duty of care owed to her. As a consequence of that breach and the application of the Paste, Ms Janos has suffered injuries, scarring and disfigurement and she pleads that the defendant was guilty of one or more of the following negligent acts or omissions:-

    (a)    Negligently and carelessly failed to research, design and manufacture the product so as to avoid the scarring and other adverse skin reactions caused by the products used;

    (b)    Negligently and carelessly manufactured and sold the product when it knew or reasonably should have known of the resultant adverse skin consequences and scarring caused by its usage;

    (c)    Failed to warn of the adverse consequences caused by using the aforesaid Rejuvi Tattoo Removal System;

    (d)    Failed to recall the said Rejuvi Tattoo Removal device when it knew or reasonably should have known of the adverse consequences caused by its use;

    (e)    Failed to properly instruct estheticians or others in its proper usage.

70    Ms Janos also pleads that she had been left with a permanent scar despite the warranties and representations that have been made to her. She also alleges that the second defendant in these proceedings, the defendant in the Illinois proceedings, failed to warn her of adverse results experienced on prior customers with the tattoo removal system.

71    Ms Janos commenced her proceedings in 2001. The fate of those proceedings is unknown. It is known that in 2008 Messrs Saini et al reported in the publication Dermatologic Surgery of the adverse reaction to the application of the subject Paste upon a patient and the sequelae of such applications. As well, in the publication "Medill News Service" a publication of the Medill School of Journalism of 23 April 2012, the news service reported upon the commencement of the proceedings by Tracey Janos in the Illinois Court. It relevantly reads as follows:-

    Tracey Janos, 34, of Foothill Ranch, California went to a Schaumberg Clinic on April 26 2001 to have a bird tattoo taken off. She claims the advanced laser and anti-aging centre botched the procedure, leaving her scarred. This week she sued the... Rejuvi Laboratory.

72    A paper was published in the publication called "Burns" produced by Elsevier entitled "Case Report – full thickness skin loss following chemical tattoo removal: A Snelling and others published 18 July 2005." Dr Snelling is a member of the Department of Plastic and Reconstructive Surgery, Odstock Centre for Plastic Maxillofacial and Burns Surgery, Salisbury District Hospital, Salisbury UK. The paper discusses a 39 year old man who presented to his local

emergency department with a persistent open wound following a single chemical treatment to a 10x6cm tattoo on his right lateral lower leg four weeks earlier. It reports that the patient had been treated by a non-medical practitioner using the E-Raze Tattoo Removal System (Rejuvi Laboratory Inc San Francisco California USA). It goes on to report that three days after the treatment he noticed an ulcerating lesion within the tattoo. This developed into full thickness skin loss corresponding to the treated area. Clinically this had the appearance of a chemical burn. He underwent debridement of the wound, including the residual tattoo and split thickness sheet skin grafting to reconstruct the defect.

73      The authors then discuss the method of the application of the Rejuvi Paste and said as follows:-

> The mechanism of… chemical tattoo removal is purported to "leach" pigments from the skin. This would suppose that a local inflammatory reaction is caused which extrudes pigments from the dermis. This clearly needs to be a carefully controlled process and incorrect application may lead to a chemical burn. Of the substances used, Zinc and Magnesium Oxide are known respiratory and eye irritants, Isopropanyl and Triethanolamine are harmful by skin absorption, Benzoic Acid may cause an allergic skin reaction while Calcium Oxide is recognised to cause severe irritation or burns when it comes into contact with the skin. It is likely that the incorrect placement of the solution (by over injection or excessively deep infiltration) combined with the irritant nature of its constituents caused a burn in this case… our patient would undoubtedly have developed hypertrophic scarring if his presentation had been significantly delayed with the wound healing by secondary intention.

74      Importantly, the authors then go on to say:-

> We wish to express our concern with regard to the current lack of licencing for the use of this product. Such treatments are clearly operator-dependant and therefore need adequately trained and supervised personnel. We believe that tighter regulations are required for those practicing such techniques and the potential complications must be clearly discussed before offering treatment.

75      In the British Journal of Dermatology 2004 (©2004 British Association of Dermatologists) Dr E Veysey and Dr AMR Downs of the Department of Dermatology Musgrove Park Hospital Taunton Devon UK reported upon two persons who had been treated with the Rejuvi System. The first suffered a large inflammatory response which lead to an unsightly hypertrophic 8x10cm scar across the middle of the forearm. The second patient who underwent only a partial clearance of a tattoo suffered areas of permanent hypopigmented scar tissue among areas of partially resolved tattoo. The authors considered the content of the Paste and its method of application. On page 770, they said:-

> It (the Rejuvi Tattoo Removal System) is supposed to induce an inflammatory response within the upper dermis, resulting in shedding of the skin and disruption of the tattooed pigments. This method is not registered as a medical device and can be practised with no specific licence.

76　　　After considering other methods of treatment, the authors concluded at page 771 as follows:-

> The Rejuvi Tattoo Removal technique is being marketed as safe, simple, cheap, quick and non-colour selective method of tattoo removal. Only small areas are treated at a time so the overall cost may not differ greatly from that of a series of standard QS laser treatments. There are no laws regulating this kind of practice and our anecdotal evidence suggests that such a method is not only less effective than other laser treatment, but can also result in unacceptable scarring. Tighter regulation and accountability by legislation are needed to protect patients from non-medical personnel practicing cosmetic or medical procedures.

77　　　Finally and for the sake of completeness it is appropriate to state that the second defendant's product which is the subject of these proceedings has now been banned from use in the European Union. On 22 May 2010, the Department of Information – Malta published a document on behalf of the Malta Standards Authority. The information document is numbered 0948. It reads as follows:-

**MSA ORDERS WITHDRAWAL OF HAZARDOUS TATTOO REMOVER FROM THE MARKET**

The Malta Standards Authority (MSA) has been notified by the European Commission that Rejuvi Tattoo Remover constitutes a serious risk to consumers due to its pH-value of 13.8 and its highly corrosive potential.

This product is to be withdrawn from the market with immediate effect.

The MSA notifies that persons using this product should stop doing so and should return it from the place of purchase. Consumers should be aware that the product may not be used and should ask that the product being used on them is identified.

Economic operators who have placed the product on the market have to make arrangements with their clients who have the product withdrawn and recalled from the market, as well as to contact the MSA.

The Malta Standards Authority will also take other action as prescribed by law if the product is found on the market during inspections.

**+ pr0948a**

**+ pr0948b**

**DOI-22.05.2010**

78　　　In light of this material, the plaintiff has fully substantiated paragraph 15 of the Statement of Claim. The material which has been surveyed above, discloses the following:-

　　　1.　　The method of application of the Paste requires a re-tattooing procedure involving the insertion through a needle of the Paste into the skin of the customer. The Paste is intended to cause a reaction in the dermis of the skin. That reaction is in the form of an eruption of

the skin, akin to the process of burning whereby the body sheds the affected skin and thereby also sheds the layers of skin affected by the tattoo;

2. The treatment is carried out by non-medically trained personnel. It may generally be described as a tattoo process conducted by persons who do not ordinarily involve themselves in tattooing. Therefore, implicitly, if not actually, there will be a variation in the depth into the dermis and epidermis into which the Paste is inserted into the skin of the customer. Howsoever deep the Paste is inserted, the intended reaction is an eruptive one with the result and consequences as above described;

3. The available medical literature indicates that the process inevitably leads to scarring at the site of the treatment and also pigmentation of the skin described as hypopigmentation and hypertrophic scarring;

4. The proceedings commenced by Ms Janos in Illinois alleged that Ms Janos had suffered adverse skin consequences, scarring, pain and suffering, disability and loss of normal life as well as disfigurement as a result of the process of the application of the Paste.

79     In 2007, in light of the material that was known (the legal proceedings) and ought to have been known of the subjects of the reports within the medical journals (who had suffered the effects of the treatment before the articles were published and therefore at least implicitly prior to the plaintiff undergoing her treatment), it is apparent that the second defendant knew or ought to have known of the faults within the Paste and some of their sequelae. It may also be assumed that before an article is published in a learned journal, it will be subject to the usual processes of peer reviews. These articles make clear that the second defendant was not in a position to produce and promote the use of the Rejuvi Paste absent a number of very clear warnings in relation to the obvious and known consequences of the use of that Paste.

80     I am satisfied that the consequences suffered by the plaintiff as a result of the application of the Paste are as described by the plaintiff in her pleadings and in the further materials which I have received within Exhibit P2 based only upon the content of the Statement of Claim. I am satisfied that in the quite peculiar circumstances of this case, sufficient of the consequences suffered by the ordinary person of the application of the Paste was known or ought to have been known to the second defendant that a number of legal consequences followed. The second defendant was, as at 2007 at the least, under a duty to inform any user or consumer of the product of the risk of the sequelae of its application. These include a warning about the chance of the deep burning detailed of the consumer's skin once the substance is used and the difficulties so caused. They also include the prospect of hypopigmentation and scarring, perhaps severe scarring. At that time, sufficient and strong warnings of these deleterious side effects should have been given to any potential consumer of the product. All forms of (misleading) advertising should have been withdrawn and steps should

have been taken to substitute correct advertising material that properly, accurately and fairly described the physical damage that a consumer could suffer arising from the use of this product. Any form of advertising that suggested that the skin could be restored to pre-tattoo condition was demonstrably wrong and misleading.

81    As a result, the second defendant had or should have had in their contemplation all potential consumers who may have been affected by the misinformation then available through these misleading forms of advertising when making their choice whether to use this product. The available advertising material produced by the second defendant was so misleading that, in light of the current information that was known to that defendant, there arose a duty and an obligation to correct that misleading material. That duty arose generally in respect of each person in the contemplation of the second defendant who may have received and relied upon this material. This is not in the nature of a liability in an indeterminate amount for an indeterminate time to an indeterminate class.[20] The duty arises only in respect of that very narrow class of persons who are seeking the services of someone to remove a tattoo. Such persons are by their very nature vulnerable and are completely reliant upon information given to them about such a process and the results. The information given to this plaintiff was grossly misleading, failed to identify known issues of difficulty and damage that any potential customer should have been warned about, and misrepresented the potential result of the process and its sequelae.

82    In these very narrow and peculiar circumstances the second defendant came under a duty to those persons who were or should have been in its contemplation, namely potential users of the Paste and recipients of treatment, to warn of those dangers and ensure that such persons made a fully informed choice about such matters. The second defendant breached that duty by doing nothing. The plaintiff was a person who should have been in its contemplation as being so affected by its conduct that a duty arose in the second defendant to ensure that the plaintiff made an informed choice. The second defendant breached that duty.

83    As I have set out above, the advertising of the product was misleading and in reliance thereon the plaintiff entered into the contract for services with the third or fourth defendants. In light of my earlier findings, it is not necessary to analyse the facts of this matter having regard to the application of the *Trade Practices Act* (TPA) or the *Fair Trading Act* (FTA). It is sufficient to say that any remedy available under those statutes arises as between plaintiff and the first, third and fourth defendants will be subsumed in any finding that I make or whether the plaintiff is entitled to a remedy at common law. And I do not need to address here the coverage of this legislation to, for example, the conduct of a corporation overseas but which falls within the jurisdiction of this Court and the expanded jurisdiction provisions of the TPA. This is because the offending behaviour took place here in South Australia.

---

[20]  *Ultramares Corporation v Touche* 174 N.E. 441 (1932) per Cardozo J.

84     In the result, I am satisfied of the following matters:-

1.     When the first defendant produced the promotional material which was supplied to the Platinum Beauty business it engaged in conduct that was misleading and deceptive because those who may be contemplated as the recipients of that material such as the plaintiff were not made aware of the possibility of long term injury, scarring or burning from the application of the Paste. I am satisfied that such conduct was in breach of s 56, s 58(a), s 58(e), s 63 and s 64 of the *Fair Trading Act 1987 (SA)*.

2.     The Paste was manufactured goods and the plaintiff was a consumer of those manufactured goods within the meaning of the *Manufacturer's Warranties Act 1974 (SA)*. For the purposes of that Act, the first defendant was at all material times a manufacturer of manufactured goods and therefore owed to the plaintiff a statutory warranty pursuant to s 4(a)(c) of that Act that the goods were of merchantable quality. The Paste was not of merchantable quality because it was not fit for purpose for which goods of that kind are ordinarily purchased and so the first defendant was in breach of an express warranty and statutory warranty and is liable to the plaintiff for damages pursuant to s 5 of the *Manufacturer's Warranties Act 1974* aforesaid.

3.     Alternatively, the first defendant is deemed pursuant to s 74AB of the *Trade Practices Act 1974* to be the manufacturer of the Paste and the first defendant is liable pursuant to s 75AD of the *Trade Practices Act 1974* to the plaintiff for the injuries that she has sustained.

85     In those circumstances, I am satisfied that the plaintiff is entitled to be given a remedy in damages against the first defendant for breach of duty and or damages for breach of the statutory warranty under s 5 of the *Manufacturer's Warranties Act 1974* and or damages pursuant to s 75AD of the *Trade Practices Act 1974* and or damages for breach of statutory duty pursuant to s 84 of the *Fair Trading Act*. I am separately satisfied that the plaintiff is entitled to an award of damages against the second defendant for breach of duty for the reasons that I have already set out.

86     I have set out below the assessment of damages that I have made in this case. That assessment is based upon my findings that the first and second defendants are in breach of the duty of care which they owed to the plaintiff in allowing the plaintiff to undergo the treatment for the removal of tattoos using the Paste but without proper warnings as to the known deleterious side effects of the use of such Paste. At the end of this judgment, I have set out my final assessment of damages which has been adjusted for contingencies. I have formed the view that although the assessment of damages is based upon what may be described as the usual method of assessment for a breach of duty claim, the result would be no different if my assessment of damages was based upon the operation

of s 82 of the *Trade Practices Act* and its equivalent under the *Fair Trading Act*. That is because an assessment of damages under the Fair Trading Legislation is carried out on the basis of "deceit" and I consider that the heads of damage claimable under an assessment of damages in deceit would be identical to the heads of damage that are allowable under a breach of duty claim. I am similarly of the view that an assessment of damages under s 5 of the *Manufacturer's Warranties Act 1974* would achieve the same result because although the assessment is made on the basis of a breach of warranty of merchantability and fitness for purpose, the burns and nerve damage suffered by the plaintiff as a result of the application of the Paste following the breach of warranty is the same. I consider that, for that reason, the assessment of damages would be the same under that Act. I have therefore made one assessment of damages and I have not made a distinction between the claims of the plaintiff against the first defendant or the second defendant on these grounds. The same position pertains to the fourth defendant and I have not separately assessed damages in respect of the third defendants because I have been informed that a resolution has been achieved with the third defendants.

87    The only point of distinction that may arguably exist is in relation to non-economic loss. As will appear hereunder, I have made my assessment of non-economic loss under the relevant provisions of the *Civil Liability Act 1936*. I have done so deliberately because I am of the view that to adopt this method is to use a conservative approach in the assessment of damages. On one view it may be argued that the claim of the plaintiff should not be circumscribed by the operation of the *Civil Liability Act* in the way that I have approached this assessment. I did not receive any submissions on that point and I have therefore proceeded to assess the matter in accordance with the requirements of the *Civil Liability Act*.

88    As well, I consider that if there was to be any challenge on the question of jurisdiction then it was incumbent upon the second defendant to file a Notice of Address for Service or otherwise take such steps as required under the Rules promulgated for the purpose of this Court dealing with proceedings that involve the Hague Convention Rules. This Court is mindful of the limits of its own jurisdiction, particularly over a foreign corporation. I am satisfied that the causes of action exist, that they arose in South Australia and that this Court is an appropriate forum for these proceedings. I am satisfied that the proceedings have been served in accordance with the Hague Convention requirements and that the second defendant has failed to discharge its responsibility to respond to the proceedings properly served upon it. In the whole of these circumstances, in the absence of any response from the second defendant and following the plaintiff securing judgment in her favour against the second defendant, I am now in a position where I may proceed to assess damages (if any) suffered by the plaintiff.

89    In the absence of any pleading to the contrary, I am now required to make an assessment of damages on behalf of the plaintiff having regard to those

35

pleadings and that material. I do so on the basis that the second defendant now admits the claim of the plaintiff.

## Assessment of damages

### *Non economic loss*

90      Section 52 of the Civil Liability Act 1936 reads as follows:-

52—Damages for non-economic loss

(1)     Damages may only be awarded for non-economic loss if—

(a)     the injured person's ability to lead a normal life was significantly impaired by the injury for a period of at least 7 days; or

(b)     medical expenses of at least the prescribed minimum have been reasonably incurred in connection with the injury.

(2)     If damages are to be awarded for non-economic loss, they must be assessed as follows:

(a)     the injured person's total non-economic loss is to be assigned a numerical value (the *scale value*) on a scale running from 0 to 60 (the scale reflecting 60 equal gradations of non-economic loss, from a case in which the non-economic loss is not severe enough to justify any award of damages to a case in which the injured person suffers non-economic loss of the gravest conceivable kind);

(b)     the damages for non-economic loss are to be calculated in relation to an injury arising from an accident that occurred during 2002 by multiplying the scale value by $1 710;

(c)     the damages for non-economic loss are to be calculated in relation to an injury arising from an accident that occurred during 2003 as follows:

(i)      if the scale value is 10 or less—by multiplying the scale value by $1 150;

(ii)     if the scale value is 20 or less but more than 10—by adding to $11 500 an amount calculated by multiplying the number by which the scale value exceeds 10 by $2 300;

(iii)    if the scale value is 30 or less but more than 20—by adding to $34 500 an amount calculated by multiplying the number by which the scale value exceeds 20 by $3 450;

(iv)     if the scale value is 40 or less but more than 30—by adding to $69 000 an amount calculated by multiplying the number by which the scale value exceeds 30 by $4 600;

(v)      if the scale value is 50 or less but more than 40—by adding to $115 000 an amount calculated by multiplying the number by which the scale value exceeds 40 by $5 750;

Case 1:16-cv-05004-JSC Document 1 Filed 10/07/16 Page 43 of 55

    (vi)  if the scale value is 60 or less but more than 50—by adding to $172 500 an amount calculated by multiplying the number by which the scale value exceeds 50 by $6 900;

  (d)  the damages for non-economic loss in relation to an injury arising from an accident that occurred in a subsequent calendar year are to be calculated in accordance with paragraph (c) but the amount arrived at is to be adjusted (to the nearest multiple of $10) by multiplying it by a proportion obtained by dividing the Consumer Price Index for the September quarter of the previous calendar year by the Consumer Price Index for the September quarter 2002.

91      I am required to assign a number between 0 and 60 in relation to my assessment of the plaintiff's non-economic loss. I am required to assign a numeral under s 52(2)(d) of the Act for the period 2007 and this numeral will reflect the nature and extent of the injury suffered by the plaintiff and the disability arising in comparison with a most severely injured hypothetical plaintiff.

92      The plaintiff claims injuries in the nature of psychological and psychiatric conditions. She also claims in respect of physical injuries as a result of the nerve damage to her leg including the neuroma and the compression of the peroneal nerve. I have already described above what the plaintiff says about the shooting pain from her ankle through her leg to her back and I have set out the detail of Mr Carney's report. The plaintiff has undergone a procedure in an attempt to free the entrapment of the peroneal nerve. The medical information before me indicates that procedure was not successful and the reports that I have received in evidence indicate that no further surgery will improve that condition.

93      In submissions, the plaintiff sought an allowance for a cystic nephroma which she has now developed. That matter has now been pleaded in the fourth Statement of Claim. I am satisfied on the material placed before me that the exposure of the plaintiff to the chemical triethanolamine (TEA) at the level of 7% in the surgical Paste is a cause of the cystic nephroma of her left kidney. On the information before the Court, that cyst measures some 40mm in length but it is not malignant. The information before the Court is that there is a possibility of between 5-10% that this cyst may become malignant. I accept that this is not a statistically high level of possibility. The authorities that bind me allow me to make some allowance in favour of the plaintiff only if I am satisfied on the balance of probabilities that the possibility arises. In order to be so satisfied that the causal connection between exposure and condition must be established on the balance of probabilities, I must be satisfied that it is more likely than not that the condition of the cyst will become cancerous. Absent such a finding, I may only make an assessment of the condition as it subsists based on the evidence before me. I consider that because of the rarity of this condition and the medical evidence before me namely: report of Dr Rachel Dunlop dated 13 December 2012 and the report of Dr Judith Ford of 18 March 2014 I can be satisfied on the balance of probabilities only that the exposure to the Rejuvi Paste

product is a cause of the cystic nephroma as suffered by the plaintiff. That is the basis upon which I will proceed to make an assessment of damages on this topic.

94      As the medical reports disclose, the plaintiff previously suffered from chronic fatigue syndrome. Her case is that the problems of her chronic fatigue syndrome are now more broadly based and are exacerbated. The medical evidence also discloses that she has been diagnosed with symptoms of post traumatic stress disorder, anxiety, depression, adjustment disorder, stress, depressed mood and mixed anxiety and these conditions are all chronic. The plaintiff contends that these conditions have all had a very deleterious effect on her emotional and mental health as well as her physical condition. They have severely restricted her enjoyment of life.

95      I also take into account the scarring and disfigurement associated with the removal of both tattoos which has left the plaintiff with a scar of approximately 7cm long over the lateral aspect of her right ankle, and a further scar of approximately 30cm running from the mid thoracic spine down to the mid sacrum. Mr Tony Moore, Plastic and Reconstructive Surgeon, noted in his report of 21 September 2009: "A tattoo will give permanent scarring… subsequent removal of the tattoo in which ever form will also give rise to permanent scarring…"

96      The plaintiff has also developed an antalgic gait as described by Ms Eleni Fotiadis, physiotherapist. Upon examination and observation, Ms Fotiadis noted that the plaintiff tended to load her weight on the left leg to avoid an increase in pain to her right ankle. This was confirmed by Mr Paul Carney, neurosurgeon, who observed the plaintiff avoided weight bearing on her right leg to some extent. He did however note her gait was otherwise normal.

97      Based upon the information that I have received, I believe a figure of 29 points clearly reflects the pain and suffering suffered by the plaintiff. This assessment also reflects an assessment for the effects of the plaintiff suffering the cystic nephroma. This results in a figure of $74,430.00 for injuries occurring in 2007.

### Past economic loss

98      I have received in evidence[21] a copy of the Clerk's Award Rates and the Bank Supervisor Award Rates. The plaintiff confined her claim to the Clerk's Award because she concedes that as a result of her long break from employment due to her chronic fatigue syndrome, it would be unlikely that she would have been able to obtain a bank supervisor's role in the period to the date of this assessment. The plaintiff has claimed seven years of loss of income at a total sum of $233,117.88. This is to the period 30 June 2014. I will allow a further amount of $74,200 on top of that figure to 30 June 2016 for the sake of calculation. That amount in total is in the sum of $307,317.88. Making the appropriate allowance

---

[21]   Exhibit P2 page 220-224 and page 230-232.

at 11% for superannuation in the amount of $32,650.66, the total claimed allowance is $339,967.66.

99    It is necessary to state at this juncture that overall, an allowance for contingencies in the amount of 15% is usually allowed. In this case, I am of the opinion that on the state of the evidence there is doubt that the plaintiff would have obtained employment from 2007 onwards as she claims. I have formed the view that a reduction must be made to this and other claims to reflect what I perceive to be the reality of the situation as it pertains to the plaintiff. These are all broad based assessments and I am left to do the best that I can. In these instances, it is appropriate to make a deduction of the plaintiff's claim because there is sufficient doubt that in her pre-injury condition the plaintiff would have been as employable as she contends. This is akin to a loss of chance assessment and it is necessary for me to adjust the assessment based upon these views that I have formed. I am satisfied that an overall reduction should be made in respect of the period between 2007 and 30 June 2016. I think that the appropriate way to proceed is to make a global adjustment at the end of my assessment. This is more appropriate because it will be a broadly based across the board adjustment that more closely reflects the reality of the situation.

### Future economic loss

100    The plaintiff claims that her medical condition is permanent. She has the support of the neurosurgeon Mr Carney and other medical practitioners. She contends that her psychological condition "feeds off" the medical condition that she suffers and so her pain sets off her psychological reaction. Also, her physical condition which exists as a result of the surgery that she has undertaken, restricts her in terms of her employability and in relation to the domestic tasks that she is able to perform. The plaintiff contends that the assessment of future economic loss should be at the level of the earnings of a branch supervisor at a bank with the expectation that the plaintiff would have progressed to a level where she would have achieved the appointment as a bank supervisor.

101    In submissions I raised with Counsel the fact that having regard to the developments within the banking industry and the changing face of banking in the 21st Century, it would not necessarily be a reasonable expectation that persons with the level of education and expertise of the plaintiff would continue to be employed in the banking sector at all. The expectation would be that the banking sector is moving more towards electronic banking and away from personal relationships between bankers and customers. The plaintiff's response was the claim for past economic loss was made only on the Clerk's rate and not on the rate for a banker. She argued that within the 7 years of allowance there set out, the ordinary expectation is that she would have progressed within the banking seniority and would have reached the level of remuneration which was the equivalent to the bank supervisor rate of, on average, $55,000 per annum

39

gross, $44,500 net. The plaintiff relies upon the report of Hayes Consultants.[22] A consulting actuary has provided a report[23] and the plaintiff contends that the appropriate multiplier is $712. Based upon a claim of an annual salary of $44,500 net, using a multiplier of $712 leads to a calculation of future economic loss in the amount of $609,307.69.[24] An allowance is also required to be made for future economic loss for superannuation at the usual rate of 11%. Applied to the sum of $609,307.69 this derives a figure of $67,023.84, in total $676,331.53. In order to make a calculation as at 30 June 2016 I would round this figure up to $725,412.90.

102    As I have already described, an overall reduction would be made for contingencies as well as for my assessment of the prospects of the plaintiff obtaining and maintaining employment at that level. Obviously enough, any general reduction in respect of future economic loss would not be as severe as for past economic loss however some significant allowance is required to be made for the same reasons. In all of the circumstances of the case, in the exercise of my discretion I need to make a reduction in respect of loss of future earning capacity.

### Special damages

103    The first item of special damages is medical expenses paid. This is in the amount of $7,951.95. Medicare has made a claim for reimbursement in the amount of $6,309.30 and I will take that matter into account in addition to the figure of $6,309.30 giving a total of $14,261.25.

104    The plaintiff has also made a claim for pharmaceuticals in the amount of $1,180.85 for which an allowance must be made. Travel expenses are claimed in the amount of $1,421.91 based upon a total travelling kilometre assessment of 2,897km as follows:-[25]

**From former residential address in Findon:-**

| Destination | Kilometres travelled | No. of visits | Total kilometres travelled |
|---|---|---|---|
| InForm Physio | 10 | 9 | 90 |
| Wakefield Hospital | 19 | 1 | 19 |
| District Court | 18 | 10 | 180 |
| Hindmarsh Medical Centre | 8 | 20 | 160 |

[22] Exhibit P2 page 230-232.
[23] Exhibit P2 page 170.
[24] $44,500 ÷ 52 x $712 = $609,307.69.
[25] See Exhibit P2 pages 61-62.

*[2016] SADC 62*

40

| | | | |
|---|---|---|---|
| Brooker Medical Clinic | 30 | 4 | 120 |
| Dr Galletly | 18 | 1 | 18 |
| Dr Forrester | 18 | 12 | 216 |
| Andersons Solicitors | 18 | 12 | 216 |
| Johnston Withers Solicitors | 18 | 14 | 252 |
| Findon Pharmacy | 8 | 17 | 136 |
| Calvary Hospital | 15 | 1 | 15 |
| Dr Wayte | 14 | 2 | 28 |
| Flinders Medical Centre | 35 | 2 | 70 |
| Adelaide Day Surgery | 12 | 10 | 220 |
| Dr Schultz | 20 | 1 | 20 |
| Dr Vrodoz | 16 | 1 | 16 |
| Total | | | 1,704km |

**From current residential address in Clearview:-**

| Destination | Kilometres travelled | No. of visits | Total kilometres travelled |
|---|---|---|---|
| Dr Carney | 12 | 1 | 12 |
| Johnston Withers Solicitors | 20 | 5 | 100 |
| RG Eckermann & Co | 18 | 4 | 72 |
| Queen Elizabeth | 24 | 8 | 192 |

[2016] SADC 62

41

| Hospital | | | |
|---|---|---|---|
| Royal Adelaide Hospital | 18 | 2 | 36 |
| Wakefield Hospital | 20 | 1 | 20 |
| District Court | 20 | 5 | 100 |
| Prospect Medical Clinic | 10 | 15 | 150 |
| St Andrews Hospital | 24 | 1 | 24 |
| Perrett Partners Imaging | 8 | 1 | 8 |
| Prospect Pharmacy | 5 | 7 | 35 |
| Flinders Private Hospital | 44 | 3 | 132 |
| Colleen Eddie | 30 | 10 | 300 |
| Calvary Hospital | 12 | 1 | 12 |
| Total | | | 1,193km |

105    I allow these claims as reasonable in the total amount of $16,864.01 for this head of damage.

### Future medical expenses

106    The plaintiff's evidence is that because of the chronic neuropathy pain syndrome that she suffers, she relies on taking 3-4 painkillers per day namely Panadeine Forte, Oxy Codone and Amitriptyline. Her evidence was that she spent about $15 on Panadeine Forte every six months, $5.60 on antidepressant medication monthly.

107    The plaintiff also gave evidence of her continuing need for further psychological treatment. That treatment costs in the order of $200 per session.[26] The annual rate is approximately $4,300. The plaintiff averages out the cost to

---

[26]  Exhibit P2 page 85.

her of future medical expenses at the rate of about $50 per week. Using the multiplier provided by the actuary[27] of $931, this amounts to a figure of $46,550.

108   Having regard to my earlier finding some allowance must be made for treatment of the cystic nephroma. I would make a general allowance of $10,000. In total these damages amount to $56,550.

### Past voluntary services

109   I will make no allowance for assistance given by the plaintiff's sister as that claim is not permissible under s 58 of the *Civil Liability Act 1936*.

110   In relation to future care and services, I have not been provided with a report as to an assessment of daily living as usually prepared by an occupational therapist. I have had to rely on the oral evidence provided to me by the plaintiff, which I accept, and I am satisfied on the basis of her evidence that a maximum amount of $299 per week is claimable. This relates to household cleaning including all heavy bathroom cleaning and vacuuming, meal preparation, domestic assistance including washing, drying and ironing and shopping delivery. Exhibit MC2 to the affidavit of Ms Corso (FDN60) sets out a schedule of the costs of household activities. When an addition of all of those amounts is made and divided by 52, the weekly rate is in the amount of $299. The multiplier remains $931 as for future medical expenses because this is an assessment for life. Using the multiplier of $931 the maximum amount which may be allowed is in the sum of $278,369. This is the amount of the plaintiff's claim. It will be necessary to again adjust this for an overall contingency reduction as well as for a general reduction having regard to the views that I have formed of the position of the plaintiff.

### Punitive and Exemplary Damages

111   Under Australian law, exemplary or punitive damages are those damages awarded over and above the amount necessary to compensate a plaintiff. In order to attract an award of these types of damages, it would be necessary for a defendant to have acted in a high handed fashion or with malice.[28] An award of this type of damages is intended to deter and punish a defendant by, for example, recouping excess profits realised as a result of wilful misconduct or penalising the defendant according to the defendant's means.[29]

112   If a defendant commits a deliberately tortious act, then I am at liberty at common law to "fine" a defendant by the imposition of these types of damages. My discretion is at large and is unfettered. As the name suggests, the imposition of a fine is usually associated with behaviour by a defendant who intentionally pursues profits through tortious wrongdoing. It is necessary for a plaintiff to prove that a defendant had guilty motives and it is necessary to prove on the

---

[27]   Exhibit P2 page 171.
[28]   *Fontin v Katapodis* (1962) 108 CLR 177 at 187.
[29]   *XL Petroleum (NSW) Pty Ltd v Caltex Oil (Aust) Pty Ltd* (1985) 155 CLR 448.

43

balance of probabilities that the defendant knew or at least recklessly disregarded the illegality of its own conduct as well as the deliberate decision by the defendant to proceed with the conduct that establishes the tort with a view of net material advantage.

113    The High Court of Australia has made it clear that it is necessary to ensure that a penalty which is imposed is not greater than that which would be imposed if the defendants conduct was criminal conduct. On the question of negligence, it has rarely been the case that exemplary or punitive damages have been awarded. The position appears to be summarised in *Mayne and McGregor on Damages*[30] as follows:-

> Exemplary or punitive damages are available only where the conduct of the defendant merits punishment, which is only considered to be so where his conduct is wanton, as where it discloses fraud, malice, violence, cruelty, insolence or the like or as it is sometimes put, where he acts in contumelious disregard of the plaintiff's rights.

114    The Laws of Australia (LexisNexis publication) at paragraph [32.155] states as follows:-

> The circumstances in which exemplary or punitive damages may be available in a product related claim in negligence are where a defendant has actual knowledge of a risk and:-
>
> - Adopts a course of action intending to prevent persons at risk from becoming aware of critical information;[31]
>
> - Does not take appropriate steps to warn of a risk;[32]
>
> - Selectively generates and releases critical information concerning the risk;[33]
>
> - Does not take available opportunities to investigate the seriousness of the risk.
>
> It has been held that an award of exemplary or punitive damages require strong facts and thus must be a rare event.[34]

115    The plaintiff pleads against the second defendant that it has acted in contumelious disregard of the plaintiff's rights. To behave in a contumelious way, the contumacy must be more than what is generally to be regarded as an obstinate and wilful resistance to authority but that the second defendant has behaved in a scornful, insulting and insolent way.

116    I am unable to find, on the evidence before me that the defendant has so behaved. I have seen the articles published by Dr W Cheng, the senior executive

---

[30]  12th Edition 1961 at page 96.
[31]  *Ali v Hartley Pointon Limited* [2002] VSC 113.
[32]  *AB v Southwest Water Limited* [1982] MLJ 26 June 1992; *Chloroben Chemical Corp v Comegys* 464 A2d 887 (Dell 1983); *Ford Motor Co. v Nowak* 638 SW2d 582 (1982); *Rawlings Sporting Goods Co Inc v Daniels* 619 SW2d 435 (1981); *Nixon v Phillip Morris Aust Pty Ltd* (1999) ATPR 41-707.
[33]  *Tetuam v AH Robins Co* 738 P2d 1210 (Kan 1987); *Nixon v Phillip Morris (Aust) Pty Ltd*.
[34]  *Crump v Equine Nutrition Systems Pty Ltd (T/A Horsepower)* [2006] NSWSC 512.

of the second defendant. Despite what I may otherwise think I am unable to establish whether or not the views expressed in those articles are other than genuinely held. This is not inconsistent with the findings that I have made on the question of breach of duty. The two questions are quite different. There is also an area of doubt here because the success or otherwise of the treatment may only in part be determined by the skill of the operator. A number of the published articles were concerned with the fact that an untrained operator with no medical background was performing a procedure which brought about such a reaction. However, that reaction was intended because of the nature of the product being used. Thus, a skilful operator applying the product may create a favourable result. On the other hand, the banning of the product within the European Union would tend to point in the other direction. In those circumstances, where there are indications both ways in relation to the matter, it is my view that the plaintiff has not made out her case for exemplary damages.

117     I therefore assess total (unadjusted) damages under the following headings and in the following amounts:

| Head of damage | Amount awarded |
| --- | --- |
| Non-economic loss (29 points) | $74,430.00 |
| Past economic loss | $339,967.66 |
| Future economic loss | $725,412.90 |
| Special damages | $16,864.01 |
| Future medical expenses | $56,550.00 |
| Past gratuitous services | $nil |
| Future services | $278,369.00 |
| Punitive and exemplary damages | $nil |
| Total | $1,417,268.03 |

**Adjustments and deductions**

118     It is then necessary for me to adjust the damages claims and assessments according to contingencies and risks. I have given this matter considerable thought. I am not satisfied that because of her other pre-existing conditions, that there was anything more than a 55% possibility of the plaintiff obtaining employment prior to trial and in my opinion there would need to be a reduction of 45% in the amount of the damages claimed for past loss of earning capacity. I would make no reduction at the same level in relation to past medical expenses. I consider that all of these expenses have been incurred as a consequence of the breach of duty of the defendants. In my calculation, the reduced figure for past economic loss is $186, 982.21.

119     In relation to the question of future loss of earning capacity, I do not think that the same level of reduction should be applied. In making my assessment under this head of claim, I am guided by the medical reports of the specialist psychiatrist and the neurosurgeon. Both speak of a significant loss of capacity that may or may not be permanent. And it is to be recalled that here my

assessment is largely in relation to capacity. It does not lie in the mouth of the second defendant to criticise the plaintiff or, perhaps, to suggest that the plaintiff had an overinflated view of her worth or that she should be more robust. That is not the appropriate way to proceed in this matter, especially when it is known that these proceedings exacerbated the plaintiff's chronic fatigue syndrome. This exacerbation is another overlay upon the difficulties suffered by the plaintiff that led to her condition of being unable to work. I accept that position of the plaintiff because it is supported by the medical evidence. I would only make reduction of 30% under those heads of damage. I would reduce the claim of the plaintiff for further medical expenses and for future care in the same amount.

120    Finally, for the sake of completeness, it remains necessary to deal with the issue of the involvement of the third defendants and the issue of causation. The nerve injury suffered by the plaintiff (the neuroma) was caused by the size of a tattoo needle used in the application of the Paste. The operator of the needle was an employee of the third defendants as proprietors of the business name Platinum Beauty. In that case, it may be accepted that a cause of the neural damage was the application of the Paste. Under Australian law that may not be a complete answer to the question of causation nor is it the only answer. Any discussions on this topic necessarily also involves a discussion on aspects of remoteness of damage. In the absence of evidence on the topic I need not develop that matter further. It is only necessary that I raise the topic for consideration. In my view, questions of causation and remoteness will have little part to play here. This is because the operators in Australia were repeating and relaying information from the second defendant. It was the second defendant who knew or ought to have known of the deficiencies of the product and was obligated to ensure that a proper warning system was in place. It is sufficient under Australian law that[35] the conduct of the second defendant was a cause of the loss. This is the common sense application of the rule of causation. The intervention of the actions of the applicator does not break the chain of causation. That is an issue between defendants.

121    These was no appearance of the third defendants as proprietors of the business name Platinum Beauty at the hearing and I was informed that the plaintiff had reached settlement with those defendants. One consequence of this settlement may be that if the second defendant and Platinum Beauty are to be treated as jointly liable for the harm suffered by the plaintiff then a settlement with one defendant jointly liable automatically releases the other jointly liable defendant. There is no evidence before me on that topic and again I do not need to develop it further here.

122    Adjusted for those reductions, I would assess damages as follows:-

| Head of damage | Amount awarded |
|---|---|
| Non-economic loss (29 points) | $74,430.00 |
| Past economic loss (as adjusted) | $186,982.21 |

---

[35]  *March v E & MH Stramare Pty Ltd* (1991) 171 CLR 506.

46

| Future economic loss (as adjusted) | $507,789.03 |
| Special damages | $16,864.01 |
| Future medical expenses (as adjusted) | $39,585.00 |
| Past gratuitous services | $nil |
| Future services (as adjusted) | $194,858.30 |
| Punitive and exemplary damages | $nil |
| **Total** | **$1,020,508.55** |

123    I will hear the parties as to interest, costs and consequential orders.



**FDN 83**

**IN THE DISTRICT COURT OF SOUTH AUSTRALIA**

**CIVIL JURISDICTION**

**DCCIV 1699 of 2009**

BETWEEN

**MARIA CORSO**
Plaintiff

and

**ARIAS HOLDINGS PTY LIMITED**
First Defendant

**REJUVI LABORATORY INC**
Second Defendant

**MICHELLE BABICH and BRANKO BABICH**
Third Defendants

**P.B.M. INVESTMENTS PTY LTD**
Fourth Defendant

---

### AMENDED ORDER

---

Filed on behalf of the Plaintiff, Maria Corso

Filed by

SE LAWYERS

Suite 813, 147 Pirie Street

Adelaide SA 5000

Ph: 8227 2655

Fax: 8227 2666

Email: karin@se-lawyers.com.au

L Code: 1301

P Code: 11071

Settled by:                                    George Stathopoulos

Date and time of filing or transmission:       19 August 2016

| | |
|---|---|
| **District Court Judge:** | His Honour Judge Slattery |
| **Date of Summons:** | 21 September 2009 |
| **Application made by:** | Plaintiff |
| **Date of hearing:** | Not applicable |
| **Date of order:** | 28 June 2016 |
| **Date of amendment:** | 19 August 2016 |
| **Appearances:** | Orders made in chambers |

Pursuant to the order of 27 May 2016 for judgment in favour of the plaintiff Maria Corso against the second defendant Rejuvi Laboratory Inc. for an amount to be assessed and the plaintiff's damages having been assessed by the Court on 17 June 2016 at the sum of $1,020,508.55 and this day the Court having awarded interest in favour of the plaintiff in the lump sum of $51,853.46 and the plaintiff's costs and disbursements of action fixed in the lump sum of $120,183.00

**THE COURT ORDERS that:**

1. The Plaintiff recover from the second defendant Rejuvi Laboratory Inc $1,192,545.01 inclusive of both interest, costs and disbursements.

 **DEPUTY REGISTRAR**